## The Maryland.

## The P. Smith.

*(District Court, S. D. New York. January 24, 1884.)*

1. COLLISION—RIVER NAVIGATION—HUGGING THE SHORE—STATUTES.

    By the statutes of New York, steam-boats in passing up and down the East river, from the Battery northward, are bound to go as near as practicable in the center of the river, except in going in or out of their usual berths or landings, and steam-boats meeting each other in the rivers are required to go to that side which is to the starboard of such boat, so as to enable them to pass each other with safety. *Held,* the above statutes forbid steamers to keep close to the shore on going round the Battery either way.

2. SAME—ROUNDING BATTERY—MUTUAL FAULT.

    Where two unwieldy steamers, one a tug with two schooners, were coming round the Battery in opposite directions so close to the shore that they were not visible to each other in time to avoid a collision, *held,* both in fault for being too near the shore, and that such fault in this case directly contributed to the collision.

3. SAME—VIOLATION OF STATUTE.

    Where a violation of the statute does not directly contribute to the collision, there being plenty of time and room for the vessels to avoid each other, *semble,* such violation is immaterial.

4. SAME—CAUSE OF COLLISION.

    Where the steamer M., 240 feet long and 60 feet wide, with square bows, bound from Jersey City to Harlem river, upon the ebb tide, passed close to the Battery and collided about 250 feet off pier 2 with the steam-tug P. S., having a schooner lashed on each side in tow, and both steamers had exchanged a signal of two whistles as soon as they were visible to each other around the bend, and no fault was apparent in the navigation or maneuvering of either from the time the signals were given, *held,* that the cause of the collision was that both were so near the shore that they were not visible to each other in time; that each was alike in fault in this respect, and that both were therefore liable for the damage to the schooner in tow.

5. SAME—LIABILITY OF VESSEL.

    Irrespective of the statutory provisions, the obligations of prudence in navigation forbid close approach to the piers or slips in rounding the battery. The common practice in this respect affords no justification, and vessels adopting it do it at their peril, and must be held liable for the damage when this is the proximate cause of the collision.

6. SAME—AMENDMENTS TO PLEADINGS—EVIDENCE.

    Where a cause of collision is fully presented upon the merits and all the facts have been put in evidence without objection, and there is no question of surprise or desire for further evidence, the cause should be determined upon the merits, as justice requires, and the pleadings be deemed amended to conform to the facts proved.

7. SAME—AMENDMENT ALLOWED—COSTS.

    Where the facts necessarily known to the libelant are misstated to his proctor, so that the precise faults, as finally determined, are not stated in the libel, though charged in one of the answers, *held,* the libel should be deemed amended and the libelant recover, but without costs.

In Admiralty.

*Scudder & Carter* and *Lewis C. Ledyard,* for libelant.

*Beebe & Wilcox,* for the Maryland.

*W. W. Goodrich,* for the P. Smith.

BROWN, J.   This libel was filed to recover damages for injuries to the schooner Francis C. Smith through a collision with the steamer Maryland on the fourth day of May, 1881, in the East river, off pier 2, New York.   The Maryland is 240 feet long and 60 feet wide, with square bows, used for transporting railroad cars between Jersey City and Harlem river.   She is a side-wheel steamer, with double engines, working independently.   She was upon one of her regular trips from Jersey City, having left there at about a quarter before 4 P. M.   After crossing the North river she passed into the eddy very near to the Battery wall, and probably within about 200 feet of the south ferry, the tide being strong ebb.   The schooner was in tow of the tug P. Smith, coming down the East river, lashed upon the tug's starboard side, and projecting some distance forward of the tug.   Another schooner was similarly lashed to the tug's port side.   The mainsail of the port schooner had been up for some time previous, and about the time the tug was passing pier 10 the foresail was wholly or partly raised.   The tug was intending to drop the port schooner upon reaching the North river, and go up the river against tide with the other. The wind was moderate from south to south-east and the day fair.

The libel charges fault upon both the tug and the Maryland in not keeping out of the way of each other, and in not having stopped and backed in time.   The Maryland in her answer charges the tug with the sole responsibility, through an alleged want of sufficient power to handle the two schooners properly, and for having the sails of the port schooner raised, whereby, through the wind's being abeam, coupled with the small power of the tug, they drifted down upon the Maryland with the ebb tide, making more leeway than the tug could overcome, though headed all the time two or three points off shore.   The answer of the tug charges the Maryland with fault, *first*, in keeping too near the New York piers, and that she did not change her course to avoid the tug, and did not slow, stop, and reverse in time.   The pilot of the Maryland testified that when off Staten Island ferry he saw the tug and schooners apparently off about pier 10, well out towards the middle of the river, and headed rather off the New York shore towards the southern part of Governor's island; that he gave two whistles, to which the tug immediately replied with two, and that he then starboarded his wheel and stopped his port engine.   Shortly after, on noticing that the tug, though headed away from the shore, was rather making towards it and towards the Maryland, he repeated the signal of two whistles, which was immediately answered with two from the tug, and that he then reversed the port engine and also the starboard engine.   The answer of the tug avers that the Maryland was first seen when the tug was off Coenties' slip, that is, piers 6 to 8, and that the Smith was then well out in the river.

A careful comparison of the testimony compels me to reject entirely the estimates given of the distance of the tug and the schooners from the New York shore as they came past Coenties' slip.   All the testi-

mony agrees that they were headed a little off shore; the tug was going at the rate of at least two miles through the water, and, with the strong ebb tide, about six by land. Her sails, with the wind abeam, would aid the motive power of the tug, while causing also some leeway; but her speed ahead was doubtless more, rather than less, than at the rate of six knots per hour. It could not be, therefore, over a minute and a half from the time she passed Coenties' slip until the moment of collision; and the leeway of the tug and schooners during this interval must have been comparatively slight, not over 40 or 50 feet, as stated by one of the witnesses. The precise place of the collision is, I think, very approximately fixed through the testimony of disinterested witnesses, as well as by the witnesses from the Maryland, particularly the witnesses Clark and Cahill. Their testimony, with other circumstances in reference to the position of the steamer Connecticut, which I need not here repeat, satisfy me that at the time of the collision the Maryland extended from about abreast of pier 2, back and across the south ferry, and that she was not over 250 feet distant from the end of pier 2,—probably less than that,—while the outer schooner was not over 300 feet distant from it. It is impossible for the tug with the schooners to have reached this position while headed two or three points off shore, if they were much further off when opposite Coenties' slip or pier 10. I have no doubt, therefore, that the Smith, when first seen, was within 350 feet of the shore, and she was probably intending to go into the eddy, as the Maryland had done, in rounding the Battery.

There are circumstances which lead to great doubt, also, whether, when the two steamers first sighted each other, they were not much nearer to each other than the estimates given in the testimony. From Staten Island ferry to pier 10 is about 2,000 feet; to pier 2, only about 300 feet. Hence the Maryland, from the point whence her pilot first saw the tug, viz., from off Staten Island ferry, to the point of collision, though she was going at first at a speed of five or six knots in the eddy as she passed Staten Island ferry, and then slowed down, did not go ahead much over 300 feet. The time, therefore, between the first whistles and the collision must have been very short, probably less than a minute. The clerk of the Maryland on hearing the whistles and the bells went at once from his office forward, a short distance only, and then he found the schooners but 50 feet distant. The pilot of the tug testifies that he did not see the Maryland or give his first signal of two whistles until he had reached pier 2, and that the collision was about 200 yards west of that. I have no doubt this pilot is partly in error as to where he first sighted the Maryland, but the distance of 600 feet apart at the time the first whistles were exchanged is an average between the evidence of Clark, who estimates the distance apart at 300 feet, and that of the other witnesses on the tug and schooners, who state that the Maryland was first seen when the tug was about off Coenties' slip, which was about 600 feet from the place

of collision. Their position enabled them to state exactly where they were when the whistles were blown, and their testimony is therefore much more reliable on that point than the testimony of those on the Maryland who could only estimate the position of the tug. Taking, then, the situation of the two vessels as determined upon this finding of the facts, the Maryland being a boat 240 feet long by 60 wide, in the eddy, within 200 feet of the shore off Staten Island ferry and heading for the east abutment of the Brooklyn bridge, and the tug and her two schooners coming down with a strong ebb tide, about 300 feet off Coenties' slip, and the two then for the first time seeing each other, and immediately exchanging signals of two whistles, I am not prepared to find upon the evidence any fault in the subsequent navigation of either vessel. The Maryland with her great length would not, I think, have been likely to clear the schooners by porting under a signal of one whistle, had that signal been given instead of the signal of two whistles. The evidence of the engineer and quartermaster shows that the port engine was reversed as soon as the first signal of two whistles was given. This brought the bows of the Maryland, which before were headed a little off shore, about parallel with the New York shore, but the ebb tide, when near the place of collision, catching her starboard bow, prevented her swinging further in shore; nor does it seem to me likely if the starboard engine had been reversed as soon as the signal of two whistles was given, instead of the port engine only, that this would have been any more likely to avoid the collision. The tug and schooners, also, as soon as the signal of two whistles was given, put their helms hard-a-starboard; but the motion of the tug was slow through the water, and though the schooners swung a couple of points under a starboard helm, the time was so short that they could not make any considerable offing to avoid the Maryland.

If this view be correct, the cause of the collision is to be sought further back, for it is manifest that vessels have no right to get into a position where a collision is inevitable, notwithstanding proper maneuvering by both. The charge that the P. Smith was too feeble in power to handle the schooner, properly is not sustained by the evidence, as respects her navigating where there is plenty of room, and where no quick maneuvering is required; but for quick handling in a narrow space, the tow was manifestly too cumbersome for such a tug, and she was therefore specially bound for this reason to be well out in the river. Nor can the collision be ascribed to the leeway caused by the sails. As I have said above, the effect of this cause would at most be small in the short time that elapsed between the signals and the collision, and it would certainly be partly, if not wholly, counterbalanced by the aid which the sails would give in increasing the speed, and consequently the steerage-way, of the tug through the water. The cause of the collision must, therefore, be ascribed either to the failure of the vessels to keep a proper lookout,

and to signal each other in time; or, if they were in such a situation as not to be visible to each other earlier, then either one or both vessels were in fault for navigating so close to the shore as not to come within view of each other in time to avoid the collision. The evidence shows that the two boats exchanged their first signals as soon as they came in sight of each other, viz., when the Maryland was off Staten Island ferry and the tug off Coenties' slip, each being from 200 to 300 feet only away from the piers. It follows, therefore, that the collision arose from both vessels' navigating too near to the New York shore when approaching and rounding the Battery in opposite directions.

Both boats, moreover, were proceeding in violation of the statutes of the state. By the act of April 12, 1848, (4 Edm. St. 60,) it is provided that "all the steam-boats passing up and down the East river, between the Battery, at the southern extremity of the city of New York, and Blackwell's island, shall be navigated as near as possible in the center of the river, except in going into or out of the usual berth or landing place of such steam-boat." Section 1, tit. 10, c. 20, p. *683, Rev. St., provides that "whenever any steam-boats shall meet each other on the waters of the Hudson river or any other waters in the jurisdiction of this state, each boat so meeting shall go to that side of the river or lake which is the starboard or right side of such boat, so as to enable the boats so meeting to pass each other with safety." The tug with her schooners was navigating in plain violation of the provision first above quoted, as she was far from the middle of the river. The Maryland, from the time she passed the barge office, was required by the same statute to be in the middle of the East river, instead of close to pier 2, (*The Columbia*, 8 FED. REP. 718,) and she was also plainly navigating in violation of the second provision above quoted. She had crossed the North river from Jersey City upon a course which, in the traffic about the Battery, her pilot well knew would in the ordinary course of business involve meeting other craft coming in the opposite direction. The Maryland had no call or business at the berths or slips along the New York shore, and by the statutory provisions she was, therefore, required to go around the Battery well out in the stream, so that vessels coming in the opposite direction could pass to the right with safety. Her course, however, was so near to the New York shore as to prevent other vessels' going with safety to the right at all, and it necessarily crowded them out in the stream to the left, instead of allowing them to pass to the right. So far as the statutory provisions are concerned, therefore, both vessels were equally in the wrong.

It is true that the practice is common for vessels in passing either way to hug the Battery shore in order to get the benefit of the slack water there on the ebb tide. The testimony was explicit, however, that there is no usage which gives this right to the vessels going one way rather than to those going the other way. It is practiced equally by

vessels going in either direction, and in either case it is alike contrary to the statutes and unlawful, except when the vessels are going in or coming out of their slips. Though vessels be navigating in violation of statute when a collision occurs, they will not for that reason be held liable, if this violation did not in any way contribute to the collision. Where vessels, though in unlawful proximity to the shore, see each other in time and agree upon mutual signals, and there is abundant room for either or both to keep out of the way of each other, the fact that one or both of the vessels were navigating in violation of the statute will then be deemed immaterial, as not contributing to' the collision. *The Fanita*, 8 Ben. 11; *The Frederick M. Wilson*, 7 Ben. 367; *The Delaware*, 6 FED. REP. 195. But in this case the facts, I think, show that the vessels, by reason of their nearness to the shore, could not be seen by each other in time to avoid the collision, and that from the time they were seen by each other and their first whistles exchanged the collision was inevitable. The collision in this instance must, therefore, be regarded as the direct and necessary result of their close and unlawful proximity to the New York shore; in other words, their unlawful navigation in this respect was the direct and sole cause of the collision. While navigating so close to the New York piers that they could not see a half mile along the shore, each vessel also violated rule 5 of the inspectors' rules, in not giving one long whistle in rounding such a bend.

It is no answer to a failure to comply with these various rules to say that the navigation around the Battery is so crowded that these several rules and statutes are no longer practicable or applicable, or that if followed they would produce confusion. The/frequency and the constancy of the danger arising from the increase of vessels makes the need of observing all these rules the more urgent; nor is there anything impracticable in keeping well out towards the middle of the East river in going into it, or in coming out of it. Both steamers in this case were about equally unwieldly and incapable of rapid handling, so as to avoid quickly any unexpected danger;—the Maryland, by reason of her great size; the tug, by reason of her comparatively slow motion through the water with two large schooners attached. Both were, therefore, equally bound by considerations of common prudence, as well as by statute, and the frequent adjudications of the courts, to keep away from the vicinity of the piers and slips. *The E. C. Scranton*, 3 Blatchf. 50; *The Monticello*, 15 FED. REP. 474, and cases cited; *McFarland* v. *Selby, etc., Co.* 17 FED. REP. 253.

The language of BENEDICT, J., in the case of *The Columbia*, 8 FED. REP. 716, 718, is specially applicable here.

"I have not overlooked the argument based on the testimony in respect to a usage for vessels passing up the East river keeping close to the piers in order to take advantage of the eddy-tide. But no such usage can be countenanced. It is forbidden by the law, and must in every instance be held illegal by the courts. It would, indeed, be held illegal by the courts if there were no statute, because of the unnecessary danger of collision created thereby."

Upon the argument it was urged with much warmth that the court should take no notice of faults not specifically alleged in the pleadings; and that in the determination of the case all proofs or considerations not *secundum allegata et probata* should be disregarded. *The Rhode Island*, Olcott, 505, 511; *The Vim*, 12 Fed. Rep. 906. In the case last cited the observations of the court were upon exceptions taken for want of sufficient definiteness in the libels in various particulars. While there can be no difference of opinion in regard to the proper practice and the policy of requiring early in the cause a definite statement of the faults charged by each, so far as they are known or may be reasonably ascertained, it is as well settled in the admiralty practice as it is in the practice under the state Code, that where the cause is fully presented upon the merits, and all the facts have been received in evidence without objection, and there is no suggestion of surprise, or desire to put in further evidence, the cause should be determined upon the merits of the whole case, according as justice requires, and that the pleadings should be deemed amended to conform to the facts proved. This was clearly laid down in the case of *The Syracuse*, 12 Wall. 167, 173, and has been repeatedly applied. *The Quickstep*, 9 Wall. 670; *The Clement*, 2 Curt. 363, where Curtis, J., discusses this question at large; *The Lady Anne*, 1 Eng. Law & Eq. 674; *The Oder*, 13 Fed. Rep. 272, 283; *The Rhode Island*, 17 Fed. Rep. 554, 560.

In this case the answer of the tug distinctly sets up as a fault that the Maryland was hugging the New York shore. The Maryland was, therefore, fully apprised of this charge; but the libel does not charge this as a fault, and, except the charge that the vessels did not keep a proper look-out, and slow and back in time, neither of which charges do I find sustained, the libel only avers that neither vessel kept out of the way of the other,—a general charge which could not have been intended or understood to mean an unlawful proximity to the shore. The collision seems to me plainly the result, and solely the result, of the dangerous and illegal practice of navigating close to the Battery shore, instead of keeping off in the stream, as required by law. For this, both are equally answerable. All vessels following this course must be held to do so at their peril, and be held liable for the damages, when this proves to be the proximate cause of the collision. *The Uncle Abe*, 18 Fed. Rep. 270.

The libelant is entitled to the usual decree against both. But as the facts in regard to this specific fault were sufficiently known to those on the libelant's schooner, and ought to have been made known to the libelant's proctors and specifically pleaded in the libel as a fault, costs will be withheld, in order that no encouragement may be given to loose pleadings, or to any omission to state clearly and specifically all the material facts, showing how and why the collision came about, and the particular faults on account of which a recovery is sought, in accordance with the long-established practice in admiralty causes.