Mr. Justice CURTIS
delivered the opinion of the court.
This is an appeal from a decree of the Circuit Court of the United States for the eastern district of Louisiana.
The libél alleges that the appellants shipped on board the brig Ann Elizabeth, at Wilmington, in the State of Delaware, a large quantity of gunpowder, to be carried to New Orleans, in the State of Louisiana; and that, on the shipment thereof, *166 bills of lading, in the usual form, were signed by the master of the brig; that, according to the invoices, of the merchandise specified in the bills of lading, its value was-$7)233.75; that, on the arrival of the brig at New Orleans, the libellants required the delivery of the merchandise thus shipped, but they received only a part thereof; and that the part not delivered consisted of 1,646 packages, which, according to the same invoice valuation, amounted to the sum of $>5,936.54.
The libel further-alleges that no part of that sum has been paid to the libellants; and it prays process against the brig, and a,.decree for the damages thus demanded, and for such other relief as shall to law and justice appertain.'
' The master of the brig, intervening for his own interest and that of his part-owners, admits that the shipment of goods was made, as alleged in the libel; but propounds that, in the course of the voyage, it became necessary, for the safety of all concerned, through the perils and dangers of the seas, to make a jettison of that part of the libellant’s goods which were shipped and not delivered.
The first question is, whether the claimant has shown, in support of his defensive allegation, that the jettison was occasioned by a peril of the sea. If it was, then the carrier is exonerated from the delivery of the merchandise, and has only to respond for that part of its value which is his just contributory share towards indemnity for the common loss by the. jettison. A jettison, the necessity for which was occasioned solely by á peril of the sea, is a loss by a peril of the sea, and within the exception contained in the bill of lading;
But, if the unseaworthiness of the vessel, at the time of sailing on the voyage, caused, or contributed to produce, the necessity for the jettison, the loss is not within the exception of perils of the .seas.
That there was such a necessity for this jettison as justified the master in making it, we think, is proved. In the case of Lawrence v. Minturn, (17 How., 109,) this court had occasion to consider the extent of the authority of the master to make a jettison. We then held, that “if he was a competent master; if an .emergency actually existed, calling for a decision whether to make a jettison of a part of the cargo; if ho appears to have arrived at his decision, with due deliberation, by a fair exercise of his skill and discretion, with no unreasonable' timidity, and . with an honest intent to do his duty,, the jettison is lawful. It will be deemed to have been necessary for the common, safety, because the person to whom the law has intrusted authority to decide upon and make it, has duly exercised that authority.”
*167 Ve find the case at har is within this rule. "We do not detail the evidence, because the authority of the master to make the jettison has not been seriously controvei’ted. -
This part of the case turns upon the other inquiry, whether the vessel was unseaworthy for the voyage when it was begun.
It is the hull of the vessel which"is alleged to have been unseaworthy.- To constitute seaworthiness of the hull of a vessel in respect to" cargo, the hull must he -so tight, stanch, and strong, as to. he competent to resist all. ordinary action of the sea,’ and to prosecute and. complete the voyage without damage to the cargo under deck.
. If a vessel, during the voyage, has leaked so much as to injure the cargó, or render a jettison of it necessary, one mode of testing seaworthiness is, to ascertain what defects, occasioning leakage, were found in the vessel at the end of the voyage; and then to inquire which of those defects are attributable to perils of the seas, encountered during the voyage, and which, if any, existed when it-was begun; and, if any of the latter be found, the remaining inquiry is, whether they were such as to render the vessel incompetent to resist the ordinary attacks of the sea, in the course of the particular voyage, without damage or loss of cargo. -
This vessel, on her arrival at Hew Orleans, was taken into dock, and examined. She was found to be a new vessel, and thát she had been- strained. A but, about midships, at or near the third or fourth streak, was started. The hopd-epds forward were also strained, and, on trial, it was found they would take about a thread of oakum. ,
Two worm-holes were also found in her bow, about three-eighths of an inch in diameter — one about three streaks from the keel, the other a little higher up. As the vessel was new,. there seems to be no doubt these holes were in the plank when put on the vessel, but from some cause remained undiscovered.
■ The véssel sailed from Wilmington on the afternoon of the 21st of December, 1852. The wind being northeast and strong, the vessel -came to anchor at Reedy Island, and on the 22d proceeded to sea. The master,-being a part-owner and claimant, has not been examined. The first officer appears to have died before the proofs were taken in the Circuit Court. Ho account is giviv of the second officer or the crew, except one seaman, who, together with two passengers, have been examined' on the part of the claimants, to prove the occurrences of the voyage. It would have been mpre satisfactory to have had the evidence of one or more officers of the vessel, and especially of the mate, with his log-book. Still, these'three witnesses do satisfactorily show, that on the night of the 23d of December, *168 the brig encountered a strong gale- and heavy seas, causing her to labor and strain badly. This weather continued, and the sea became more heavy, up to the night of the 27th'. Until about 8 • o’clock that night, it was not known the vessel was leaking; but, on sounding the pumps at that time, it was found that the vessel had two feet of water in the hold. The pumps were manned and kept going, but the leak increased two feet in about two hours. The jettison was then made, and the vessel so far relieved that the pumps could control the leak, and the vessel, with the residue of the cargo, arrived at New Orleans.
It is manifest that the vessel encountered extraordinary action of the sea; and, as the vessel appears to have been new, and generally stanch and well fastened, the defects found at New Orleans, except the worm-holes, are fairly attributable to this cause. The starting of a but, and the opening of the hood-ends of a new vessel of .ordinary strength, indicate a very uncommon degree of strain; and such defects would alone account for the amount of leakage of a vessel heavily laden, and exposed to such a sea as is described.
"We do not think the existence of the worm-holes amount to unseaworthiness. Any lcak which might have been occasioned by them in any ordinary sea, does not appear to have been such as the pumps could not control, without damage to the cargo. All vessels have leaks; and, independent of the strains received from the violent action of the sea, we are not satisfied this vessel would have leaked so much that the pumps could not have controlled the water in her. hold, and prevented its doing damage to the cargo.
'We find, therefore, that the vessel is exonerated from the claim for the full value of the merchandise; and the remaining question is, whether the vessel is chargeable with any part of the value of the merchandise in this cause.
When a lawful jettison of cargo is made, and the vessel and its remaining cargo are thereby relieved from the impending peril, and ultimately arrive in the port of destination, though, the shipper has not a lien on the vessel for the value of his merchandise jettisoned, he has a lien for that part of its value which the vessel and its freight are bound to contribute towards • his indemnity for the sacrifice which has been made for the common benefit. And this lien on the vessel is a maritime lien, operating by the maritime law as a hypóthecation of the vessel, and capable of being enforced by proceedings in rem.
The right of the shipper to resort to the vessel for claims growing directly out of his contract of affreightment, has very long existed in the general maritime law. It is found asserted *169 in a variety of forms in the Consulado, the most ancient and important of all the old codes of sea laws, (see chaps. 63, 106, 227, 254, 259;) and the maxim that the ship is bóund to the merchandise, and the merchandise to the ship, for the performance of the obligations created by the contract of affreightment, is a settled rule of our maritime law. (The Schooner Freeman, 18 How., 182; The Ship Packet, 3 Mason, 261; The Volunteer, 1 Sum., 550; The Reeside, 2 Sum., 467; The Rebecca, Ware’s R., 188; The Phœbe, Ib., 263; The Waldo, Davies’s R., 161; The Gold Hunter, 1 Blatch. and How., 305.)
Pothier declares (Treatise of Charter-parties, preliminary chapter on Average) that the right to contribution in general average is dependent on the contract of affreightment,, which embraces in effect an undertaking, that if the goods of the shipper are damaged for the common benefit, he shall receive a due indemnity by contribution from the owners of the ship, and of other merchandise benefited by the sacrifice.
The power and duty of the master to retain and cause a judicial sale of the merchandise saved, has also been long established. (Consulado del Mare, ch. 51, 52, 53, and note 1 in vol. 3, p. 103 of Pardessus’s- Collection; Laws of Oleron, art. 9; Ord. de la Marine, Liv. 3, tit. 8, sec. 21, 25; Nesbit on Ins., 135; Strong v. New York Firemen’s Insurance Company, 11 John. R., 323; Simonds v. White, 2 B. and C., 805; Loring v. The Neptune Insurance Company, 20 Pick., 411; 3 Kent. Com., 243, 244.) And this' right to enforce a judicial sale, through what we term a lien in ran, is not confined to the merchandise, hut extends to the vessel.
Emerigon, (ch. 12, sec. 43,) speaking generally of an action of contribution, says it is in its nature a real action. Cassaregis, (dis. 45, N. 34,)est in rem scripta.”
It would he extraordinary if the right to a lien were not reciprocal; if it existed in favor of the vessel, when sacrifice was made of part or the whole of its value, for preservation of the cargo, and not against the vessel, when sacrifice was made of the cargo for preservation of the vessel.
By the ancient admiralty law, the master could hind both the ship and cargo by an express hypothecation, to obtain a ransom on capture. So he could, and still may, when the whole enterprise has fallen into distress, which could not otherwise he relieved, hypothecate both the vessel arid cargo to obtain means of relief. These are cases of express hypothe-cation made by the master, under the authority conferred on him by the maritime law; hut he .can also sell a part of the cargo to enable him to prosecute his voyage, or deliver a part of it in payment of ransom of his vessel, and the residue of the *170 cargo, on capture; and when he does so, the law of the sea creates a lien on the vessel, as security .for the reimbursement of the loss, of the shipper- whose goods have been sacrificed. (The Packet, 3 Mason, 255; Pope v. Nickerson, 3 Story’s R., 492; The Gold Hunter, 1 Blatch. and How., 300; The Boston, Ib., 309; Consol. del Mare, ch. 105; Laws of Oleron, art. 25; Ord. of Antwerp, art. 19; Emerigon Con. a la Grosse, ch. 4, secs. 9, 11.) .
The authority to make a jettison of cargo is derived from the same source; an instant necessity, incapable of being provided for save by a sacrifice of part of what is committed to the master’s care, and the presumed consent of the owners of all the subjects at risk, that the loss shall become a charge upon what is benefited by the sacrifice. (The Gratitudine, 3 Rob., 210.) If the sacrifice be made to enable the vessel to perform the voyage, by paying what the owners are bound to pay to complete it, the charge is on the vessel and its owners. If it be made to ¡believe the adventure from a peril which has fallen on all the subjects engaged in it, the risk of which peril was not assumed by the carrier, the charge is to be borne pro-portionably by all the interests, and there is a lien on each to the extent of its just contributory obligation. This authority of the- master to make the sacrifice, and this consent of the owners of the subjects at risk to have it made, and their implied undertaking to contribute towards the loss, are viewed by the admiralty law; as sufficient to create an hypothecation of the subjects benefited, for the security of the payment of the several sums for which those subjects are respectively liable. In other words, as the master is authorized to relieve the adventurer from distress, by means of an express hypothecation, in case of capture or distress in port, or by means of a sale of part of the cargo, thereby creating á maritime lien on the property ultimately benefited, in favor of the owner of what is sold or hypothecated; so he may also, in a ease of necessity at sea, make a jettison of cargo, and thereby create a lien on the property thus saved from péril. Pothier (Con. Mar., n., 34, 72) and Emerigon (Con. a la Grosse, ch. 4, sec., 9) say that the sale of-part of the eargo in port, to supply the necessities of the ship, is a kind of forced loan. Though the sacrifice of part of the cargo at sea cannot be considered a loan, it is a forced appropriation of it to the general benefit of those engaged in a common adventure, under a contract of affreightment; and such use of the property of one, for the benefit of others, creates a charge Qn what was thus saved, for what may fairly, be termed the price of that safety. (Abbott on Shipping, part 4, ch. 10, s. 6.)
*171 Ia United States v. Wilder, (3 Sumner, 311,) which was a case of general average, Mr. Justice Story likens it to a case of salvage, where safety is obtained by sacrifices of labor and danger, made for the common benefit; and he says the general maritime law gives, a lien in rem for the contribution, not as the only remedy, but as in many cases the best remedy, and in some cases the only remedy. ; In the District and Circuit Courts of the United States, this jurisdiction has been exercised, and some cases of this kind are found in the books, though • most of their decisions are not in print. (The Mary, 5 Law Reporter, 75; 6 Ib., 73; The Cargo of the George, 8 Law Reporter, 361; Sparks v. Kittredge, 9 Law Reporter, 349; Dunlap’s Ad. Pr., 57; 2 Browne’s Civ. and Ad. Law, 122; The Packet; The Gold Hunter; The Boston, above cited.) The restricted admiralty jurisdiction in England seems insufficient to enforce this lien. (The Constantia, 2 W. Rob., 487.)
Nor is there anything in the case of Rae v. Cutler, decided by this court in. 1849, and reported in 7 How., 729, which conflicts with the view, we have now taken.
That was a libel by the owner of k vessel against the consignee of cargo, to recover the contributory share of the ave-’ rage due from the goods which the master had voluntarily delivered to the respondent before the libel was filed. The court decided, that though the master, as the agent of the own? er of the vessel in that ease, had by the maritime law a lien upon the goods, as security for the payment of their just contribution, this lien was lost by their voluntary -delivery to the consignee; and that the implied promise to contribute could not be enforced by an action in personam against the consignee, . in the admiralty. .This admits the existence of a lien, arising out of the admiralty law, but puts it on the same footing as a maritime lien on cargo for the price of its transportation; which; as is well kfiown, is waived by an authorized delivery without insisting on payment. ,
On full consideration, we are of opinion that when cargo is lawfully jettisoned, its owner has, by the maritime law, a lien .on the vessel for its contributary share of the general average compensation; and that the owner of the cargo -may enforce payment thereof by a proper proceeding in rem. against the vessel, and against the residue of the cargo,, if it has not been delivered.
The remaining question is, whether the pleadings in this case are in such form .as to present this claim for the consideration ' of this court, and entitle, the libellant to assert a lien on the' vessel for its contribution.
The rules of pleading in the admiralty are exceedingly sim- *172 pie and free from technical requirements. It is incumbent on the libellant to propound with distinctness the substantive facts on which he relies; to pray, either specially or generally, for the relief appropriate to them; and to ask for such process of the court as is suited to the action, whether in rem or in per-sonam.
It is incumbent on the respondent to answer distinctly each substantive fact alleged in the libel, either admitting or denying,' or declaring his ignorance thereof, and to allege .such other facts as he relies upon as a defence, either in part or in whole, to the case made by the libel.
The pr'pofs of each party must correspond substantially with his allegations, so as to prevent surprise. But there are no technical rules of variance, or departuré in pleading, like those in the common law, nor is the court precluded from granting the relief appropriate to the case appearing on the record, and prayed for by the libel, because" that entire case is not distinctly stated in the libel. Thus, in cases of collision, it frequently occurs that the libel alleges fault of the claimant’s vessel; the answer denies it, and alleges fault of the libellant’s .vessel. The court, finds, on the proofs, that both were in fault, and apportions the damages. ■
Looking to this libel, we find it states that a contract of affreightment was made to transport these goods from Wilmington. to blew Orleans, on board this brig; that the goods were laden on board, and. the brig had arrived, but only a part of f the goods have been delivered. It states the value of the part not delivered, avers that thé libellants have not been paid any part of that sum, prays for process against the brig, and a decree for the value of the merchandise not delivered, and also for such other relief as to law and justice may appertain.
The answer admits all the facts stated in the libel,- but sets up, by way of defensive allegation, a' necessary jettison of that part of the cargo not delivered. It is manifest, that though this answers, in part, the claim for damages made by the libel, it does not wholly answer it. It shows sufficient cause why the libellant should not assert a lien on the brig for the whole value of his merchandise, but at the same time shows that the libellant has a valid lien on the brig for that part of the value of the -merchandise which the vessel is bound to contribute. While it asserts that the performance of the contract of af-freightment . by transportation of the merchandise to Hew. Orleans was excused by a peril of the sea, it. admits that, an obligation arose, out of the relations of the parties created by that contract of affreightment, and out of the facts relied on as ah excuse for not transporting the merchandise; that this *173 obligation was to pay to the shipper a part of the value of his goods; that it was the duty of the master, at the port of New irleans, to ascertain what part of that value the vessel was hound to contribute, and that there is a lien on the vessel to secure its payment.
If the technical rules of common-law pleading existed in the admiralty, there might be difficulty in admitting a claim for general average, in an action founded on a contract of affreightment; because, though the claim for such average grows out of the contract of affreightment, the implied promise to pay it is technically different from the promise on the face of a bill of lading. In the case of Pope v. Nickerson, (3 Story, 465,) Mr. Justice Story went into a very extensive examination of such claims, under an agreed statement of .facts, in an action of assumpsit on bills of lading; and it does not seem to have occurred, either to him or the counsel, that it was inconsistent with any substantial rule of the common law so to do.
But in the admiralty, as we have said, there are no technical rules of variance or departure. The court decrees- upon the whole matter before it, taking care to prevent surprise, by not allowing either party to offer proof touching any substantive fact not.alleged or denied by him.
But where, as in this case, the defensive allegation of the' respondent makes a complete case for the libellant, so that no evidence in support of it is required, and where that case is within the form of action and the prayer of relief, and the process used by the libellant, we think it not a sufficient reason for refusing relief, that the precise case oh which the court think fit to grant it is not set out in the libel.
■ We understand, that in the court below the libellants relied on the duty of the master to adjust and collect, and pay to them, the- general average contributions, as precluding- the defence of a, necessary jettison. Wé think this defence was properly overruled. The libellants did hot there insist on their lien on the vessel for its contribution. We do not consider then’ failure to do so precludes them from calling on this court to make that decree, to which the record shows they áre entitled. In Finlay v. Lynn, (6 Cranch, 238,) this court was of opinion that the appellant, whose bill was dismissed by the Circuit Court, was entitled to an account, on a ground not assumed in the Cirepit Court. This court said: “The plaintiff probably did not apply for this account in the court below, and it does not appear to have been a principal object of his bill. This court therefore doubted whether it would be most' proper to affirm the decree dismissing the bill, with the addition that it should be without prejudice to any future claim *174 for profits, and for the debt due from one store to the other, or to open the decree and direct the account. , The latter is deemed the more equitable course. The decree, therefore, is to be reversed, and the cause remanded, with directions to take an account of the profits of the jewelry store, if the same shall be demanded by the plaintiff.” But, as the libellants failed to call the attention of the Circuit Court to this view of their rights, and-placed their claim there solely on the grounds that the jettison was unlawful, or, if lawful, could not be a de-'fence, because the master had failed to do the duty incumbent on him in a case of general average, we think the decree should be reversed, without costs. The cause must be remanded to the Circuit Court, with directions to ascertain the amount of the lien of the libellants on the Ann Elizabeth, for the share to be contributed by the vessel towards the loss sustained by the libellants, and. to enter a decree accordingly.
Mr. Justice CATROÍT and Mr. Justice CAMPBELL dissented.