SONSMITH and others *v.* THE J. P. DONALDSON.[1]

SLYFIELD *v.* SAME.[1]

*(Circuit Court, E. D. Michigan.* September, 1884.)

1. TOWAGE—NEGLIGENCE—GENERAL AVERAGE—THE DONALDSON, 19 FED. REP. 264.

The decision of the district court in this case, *(The J. P. Donaldson,* 19 FED. REP. 264,) upon the question of negligence, affirmed; upon the question of general average, reversed.

2. ADMIRALTY—PLEADING—PRAYER FOR GENERAL RELIEF.

Under a prayer for general relief, it is competent for the court to pass such decree as may be required by the proof, although not fully and precisely stated in the libel.

3. GENERAL AVERAGE — UPON WHAT FOUNDED, AND WHEN CONTRIBUTION ENFORCED.

The principle of general average contribution rests upon the doctrine that, whatever is sacrificed for the common benefit of the associated interests, shall be made good by all the interests which were exposed to the common peril, and which were saved from the common danger by the sacrifice. It will be applied when (1) the ship and cargo are placed in a common, imminent peril; (2) there is a voluntary sacrifice of property to avert that peril; and (3) by that sacrifice the safety of the other property is presently and successfully attained.

4. SAME—INEVITABLE LOSS OF PROPERTY CAST AWAY.

The fact that the property cast away would inevitably have perished even if it had not been selected to suffer in place of the whole, does not prevent the application of the doctrine of general average, unless such sacrifice did not contribute to the safety of the remainder.

5. SAME—INTENTION TO DESTROY.

It is not necessary that there should have been any intention to destroy the property cast away, as no such intention is ever supposed to exist.

6. SAME—RIGHT DEPENDS ON RELATION OF PARTIES.

The right of contribution depends upon an equity arising out of the relation of the parties, and is not based upon the contract of carriage.

7. SAME—STRANGERS—MASTER AS AGENT.

The principle is not applied between strangers, but only between those associated together in a common adventure and placed under the charge of a master with authority to act in emergencies as the agent of all concerned.

8. ADMIRALTY—GENERAL AVERAGE—TOWAGE.

The propeller sought to be compelled to make general average contribution had undertaken to tow three barges from Buffalo to Saginaw. None of the barges had any power of self-propulsion. The contract of towage was for the voyage, the propeller to receive for its services a proportion of the freight earned by each barge. Each barge had its own master and crew, but they had no voice in the management of the propeller, nor in the conduct of their own craft, except in obedience to signals from the propeller. The master of the propeller had charge of the navigation of the whole tow, for the voyage, and for the purposes of that navigation and to meet its exigencies was invested with authority to act for all. When near Erie, Pennsylvania, in a fierce storm, having been driven by force of wind and waves, and in a blinding snow, they were drifting near the rocks on shore and in imminent peril of stranding. The propeller, having signaled her tow to that effect, cut the towing line and cast them off. The propeller was thereby saved. The barges were driven on shore and wrecked. The propeller at once put into the harbor of Erie in safety. *Held,* that the propeller was bound to contribute upon the principles of a general average.

[1] Reported by J. C. Harper, Esq., of the Cincinnati bar.

In Admiralty.    On appeal from district court.

*Moore & Canfield*, for libelants, appellants.

*Maynard & Swan*, for claimant, appellee.

MATTHEWS, Justice.    These two libels were consolidated in the district court, and dismissed on the hearing.    A decree for the libelants was prayed for on two grounds:    *First*, for a loss of the barges by the fault of the propeller in towing the barges on a voyage from Buffalo to Saginaw.    *Second*, in case no fault in towing was proven, then for a proportion of the value of the barges lost, upon the principles of a general average, on the ground that they had been voluntarily cast off and lost during a storm, for the purpose and with the effect of saving the propeller.

As to the first ground, the evidence justifies and requires the conclusions of the district court.    There does not seem to be sufficient ground to impute to the propeller any negligence or failure of duty. If any error was committed, it was a mistake of judgment in the exercise of a discretion necessarily vested in the master of the propeller, and which, if a contrary decision can be supposed to have resulted more favorably, constitutes neither want of skill nor want of care. The loss of the barges, under the circumstances, must be regarded as resulting from the perils of navigation, and for which, under the contract of towage, the propeller cannot be held responsible.    It is not necessary to recapitulate the proofs in support of this conclusion. They are fully stated, with the reasons justifying it, in the opinion of the learned judge of the district court, as reported in 19 FED. REP. 264, in which, upon this part of the case, I fully concur.

There remains, however, the more difficult and doubtful question, whether the libelants are entitled to a decree for a contribution from the appellee, upon the principles of general average, on the ground that the loss of the barges was a sacrifice voluntarily made for the safety of the propeller.    The facts and circumstances material in the investigation of this, as a question of law, are not disputed, and are, in substance, as follows:    The J. P. Donaldson was a steam-propeller, with a crew of 16 officers and men, built for the carrying trade, not an ordinary tug, having no cargo on board on the voyage, during which the loss complained of occurred, but her fuel, amounting to about 120 tons.    She had in tow three barges, the Bay City, the George W. Wesley, and the Eldorado, in the order named, on a voyage from Buffalo to Saginaw or Bay City.    The Bay City was partly laden with coal, the others were light.    The George W. Wesley was a schooner barge; the Eldorado was an old propeller bottom.    Neither of them had any power of self-propulsion.    The contract of towage was for the voyage, the propeller to receive for her service a proportion of the freight earned by each barge.    When near Erie, Pennsylvania, in a fierce storm, having been driven by force of wind and waves, and in a blinding snow, they were drifting near the rocks on shore and in imminent peril of stranding.    The propeller, having

signaled her tow to that effect, cut the towing line and cast them off. They were driven on shore and wrecked. The propeller at once put into the harbor of Erie in safety. It is a reasonable conclusion that if the propeller had not cut loose her tow, all would have gone ashore together.

The libels in the present cases do not pray specifically for an adjustment of a general average loss. On the contrary, they pray for a decree against the propeller for the full amount of the loss, on the ground that it resulted from the breach of duty on the part of the propeller in not properly performing the contract of towage. But, under the prayer for general relief, it is competent for the court to pass such decree as may be required by the proof in the record, although not fully and precisely stated in the libel. In this particular the case of *Dupont* v. *Vance*, 19 How. 162, is quite in point. And in that case, speaking of jettison of cargo, Mr. Justice CURTIS, delivering the opinion of the court, said:

"If it be made to relieve the adventure from a peril which has fallen on all the subjects engaged in it, the risk of which peril was not assumed by the carrier, the charge is to be borne proportionably by all the interests, and there is a lien on each to the extent of its just contributory obligation."

In the case of *Columbian Ins. Co.* v. *Ashby*, 13 Pet. 331, in the learned opinion of Mr. Justice STORY, it is shown that the rule as to general average, derived to us from the Rhodian law through the Roman jurisprudence, was not confined to the case of jettison of cargo, although that was the illustration stated in the digest: "That the case of jettison was here understood to be put as a mere illustration of a more general principle, is abundantly clear from the context of the Roman law, where a ransom paid to pirates to redeem the ship is declared to be governed by the same rule." And the doctrine, as received among all maritime nations, was stated to be—"*First*, that the ship and cargo should be placed in a common imminent peril; *secondly*, that there should be a voluntary sacrifice of property to avert that peril; and, *thirdly*, that by that sacrifice the safety of the other property should be presently and successfully attained."

It was generally admitted that in case of voluntary stranding of the ship, if the vessel was saved, the principle of general average applied; but it was contended by some that it was not so if the vessel was lost; and such was the opinion of Emerigon, who said: "But it will be a general average if the stranding has been made for the common safety, provided, always, that the ship be again set afloat; for if the stranding be followed by shipwreck, then it is, save who can." 1 Emer. Ins. *c.* 12, § 13, p. 614. But, in opposition to this opinion, it was decided by the supreme court that the total loss of the ship did not prevent the application of the principle, saying, (page 340,) "it is the safety of the property, and not of the voyage, which constitutes the true foundation of general average;" and, in another place, (page 343,) "for the general principle certainly is that

whatever is sacrificed voluntarily for the common good is to be recompensed by the common contribution of the property benefited thereby." The same result had been previously reached by Mr. Justice WASHINGTON, in *Caze* v. *Reilly*, 3 Wash. C. C. 298.

In *Barnard* v. *Adams*, 10 How. 270, it was said that—

"In order to constitute a case for general average three things must concur: (1) A common danger,—a danger in which ship, cargo, and crew all participate,—a danger imminent and apparently 'inevitable,' except by voluntarily incurring the loss of a portion of the whole to save the remainder; (2) there must be a voluntary jettison, *jactus*, or casting away of some portion of the joint concern for the purpose of avoiding this imminent peril, *periculi imminentis evitandi causo*, or, in other words, a transfer of the peril from the whole to a particular portion of the whole; (3) this attempt to avoid the imminent common peril must be successful."

In that case the principal question arose upon the proposition urged in argument, "that if the common peril was of such a nature that the *jactus* or thing cast away (which was the ship) to save the rest would have perished anyhow, or perished 'inevitably,' even if it it had not been selected to suffer in place of the whole, there can be no contribution." But this was negatived, Mr. Justice GRIER, delivering the opinion of the court, saying that—

"It is a denial of the whole doctrine upon which the claim for general average has its foundation. * * * The *jactus* is said to be sacrificed, not because its chance of escape was separate, but because of its selection to suffer, be it more or less, instead of the whole, whose chances of safety, as a whole, had become desperate. The imminent destruction of the whole has been evaded as a whole, and part saved by transferring the whole peril to another part."

In the case of *McAndrews* v. *Thatcher*, 3 Wall. 347, Mr Justice CLIFFORD, delivering the opinion of the court, said:

"Natural justice requires that, where two or more parties are in a common sea risk, and one of them makes a sacrifice or incurs extraordinary expenses for the general safety, the loss or expenses so incurred shall be assessed upon all in proportion to the share of each in the adventure; or, in other words, the owners of the other shares are bound to make contribution in the proportion of the value of their several interests. Courts universally admit that the Rhodian law was the parent of maritime contribution, although, in terms, it made no provision for any case of general average, except for that of jettison of goods as the means of lightening the vessel. But the rule, as there laid down, has never been understood as being confined to that particular case, but has always been regarded as a general regulation applicable in all cases falling within the principle on which it is founded."

Therefore it has been extended, as in that case, to instances of involuntary stranding of the ship, when extraordinary expenses are incurred in the successful relief and rescue of both ship and cargo, menaced by a common destruction, but only for such as are incurred while the community of interest continues. If the cargo, as in that case, has been separately saved, and has been severed from its connection with the ship and its peril, subsequent expenses incurred for the benefit of the ship alone, and not part of a continuous series

undertaken originally on behalf of both interests, are not the subject of a general average contribution.

"Doubts at one time were entertained," said the supreme court in the case of *The Star of Hope*, 9 Wall. 203–231, "whether a loss occasioned by a voluntary stranding of the vessel, even though it was made for the general safety and to avoid the probable consequences of an imminent peril to the whole adventure, was the proper subject of general average contribution; but those doubts have long since been dissipated in most jurisdictions, and they have no place whatever in the jurisprudence of the United States." In that case it was also said, (page 228:)

"Authorities may be found which attempt to qualify this rule, and assert that, when the situation of the ship was such that the whole adventure would certainly and unavoidably have been lost if the sacrifice in question had not been made, the party making it cannot claim to be compensated by the other interests, because it is said that a thing cannot be regarded as having been sacrificed which had already ceased to have any value; but the correctness of the position cannot be admitted, unless it appears that the thing itself for which contribution is claimed, was so situated that it could not possibly have been saved, *and that its sacrifice did not contribute to the safety of the crew, ship, or cargo.* Sacrifices, when there is no peril, present no claim for contribution; but the greater and more imminent the peril, the more meritorious the claim for such contribution, if the sacrifice was voluntary, and contributed to save the associated interests from the impending danger to which the same were exposed. Such claims have their foundation in equity, and rest upon the doctrine that whatever is sacrificed for the common benefit of the associated interests shall be made good by all the interests which were exposed to the common peril, and which were saved from the common danger by the sacrifice * * * It is not necessary that there should have been any intention to destroy the thing or things cast away, as no such intention is ever supposed to exist. On the contrary, it is sufficient that the property was selected to suffer the common peril in the place of the whole of the associated interests, that the remainder might be saved."

The general doctrine was again stated by the supreme court in the case of *Fowler* v. *Rathbones*, 12 Wall. 102, in the following comprehensive language:

"Where two or more parties are engaged in the same sea risk, and one of them, in a moment of imminent peril, makes a sacrifice to avoid the impending danger, or incurs extraordinary expenses to promote the safety of all the associated interests, common justice requires that the sacrifice so made, or the extraordinary expenses so incurred, shall be assessed upon all the interests which were so exposed to the impending peril, and which were saved by those means from the threatened danger, in proportion to the share of each in the joint adventure."

The interests usually associated together, in reference to which questions of contribution in general average commonly arise, are those of ship, cargo, and freight; but the language in which the rule is defined, as already quoted, does not restrict it to that association of interests. The right of contribution depends upon an equity arising out of the relation of the parties, and is not based upon the contract of carriage. The obligations of the carrier, indeed, as contained in

the usual bill of lading, do not embrace the case of a part of the cargo carried on deck with the consent of the shipper, and not in pursuance of a custom of the particular trade; and the carrier is therefore in such a case not liable, as such, for a jettison of such cargo necessary for the common safety. The loss is by the perils of navigation, and excepted from the liability of the carrier. Neither is there any right of contribution, as between the deck-load cast overboard and the cargo under deck, unless the deck-load was carried in pursuance of a general custom of the trade, of which the owners of the other cargo must be presumed to take notice and to assent to. In that event, the right of contribution in case of loss by jettison would arise in favor of the cargo so carried on deck; and, as between it and the ship, it would apply, without reference to such a custom, upon the ground that the ship-owners had consented so to carry it. 2 Pars. Mar. Ins. c. 5, § 3, p. 217 et seq. and cases cited. Hence, in the case of *Lawrence* v. *Minturn*, 17 How. 100, the carrier was exonerated from liability as such for the loss of the deck-load by jettison, but without prejudice to the right of the shipper to claim for a general average contribution. In cases of jettison of cargo, the performance of the contract of affreightment by transportation of the merchandise is excused by a peril of the sea, while the obligation to contribute in general average on the part of the ship and remaining cargo arises out of the relation of the parties, as brought together into a common and associated interest united in a single adventure and saved from a common peril, as appears from the case of *Dupont* v. *Vance*, 19 How. 162. The right of the ship to contribution is certainly not founded on the bill of lading; and there is no privity of contract between the various and distinct shippers, between whom, nevertheless, the law implies, upon the facts, the obligation to make good their respective shares of a sacrifice made for a common benefit. It is therefore not inconsistent with the essential nature of the principle, that the right of contribution should be implied between other parties and interests, where relations are established by contract other than between shipper and ship-owner for the transportation of merchandise. Accordingly the opinion was expressed by Mr. Arnold, (2 Mar. Ins. 398,) that "if a number of ships are lashed together and one takes fire, and the crews of the others unite in scuttling the burning ship for the safety of the rest, the loss of the ship so sunk is a general average loss, to which all those saved thereby must contribute." This opinion, based upon continental authorities alone, Mr. Parsons (2 Mar. Ins. 217, in note) doubts; and it must be admitted that no judicial precedent to that effect has been found in the decisions of either English or American courts; and that the case as put lacks the necessary element of a common interest, united by consent of several owners, delivered by the authorized act of a common agent from an imminent peril, threatening the whole, by the voluntary sacrifice of a part.

The true principle was stated by Mr. Justice CURTIS in the case of *The John Perkins*, reported in 24 Law Reporter, 87. That was the case of a libel by the owner of a fishing schooner, the Wyvern, against the John Perkins. The latter was drifting helplessly, inclosed by a field of ice, along the shore of Massachusetts bay, and to avoid an apprehended collision with which, the master of the Wyvern cut his cable, which, with the anchor, was lost. The claim was for a contribution in general average for this loss. Mr. Justice CURTIS treated the subject in an opinion, from which the following lengthy extract is made:

"But the question here is whether a voluntary sacrifice made by one vessel, to avoid or escape an apprehended collision with another vessel, makes a case for contribution in general average. It is certainly true that such a claim, when viewed theoretically, has an equity very similar to, if not identical with, that on which the famous Rhodian law was founded, and out of which the more modern doctrines of the law of general average have grown. '*Omnium contributione sarcitur quod pro omnibus datum est.*' Poth. Pand. 14, 2, 1. '*Equissimum enim est, commune detrimentum fieri eorum, qui propter amissas res aliorum consecuti sunt est merces suos salvos habuerunt.*' Id. 14, 2, 6. At the same time it is quite clear that the Roman law never applied the principle between mere strangers. The Digest (9, 2, 29, 3) says: '*Labeo scribit, si cum vi ventorum navis impulsa esset in funes anchorarum alterius et nautæ funes præcidis sunt, si nullo alio modo nisi præcisis funibus explicare se potiunt nullam actionem dandam.*' This is the precise case under consideration, except that the cable is cut by the mariners of the other vessel, which can scarcely weaken the claim. Emerigon cites this as good law, and refers to the laws of Oleron and Wisby as containing similar rules as to the removal of an anchor. 1 Emer. Ins. 416, c. 12, par. 14. And at the common law there are cases of urgent necessity in which one whose property is destroyed has no action; as pulling down a house to prevent the spread of a fire, as was resolved in *Case of Saltpetre*, 12 Coke, 13, 16. See, also, Vin. Abr. "Necessity," Pl. 8; *Governor* v. *Meredith*, 4 Term R. 797; *Respublica* v. *Sparhawk*, 1 Dall. 363; *Mayor* v. *Lord*, 17 Wend. 290; *Russell* v. *New York*, 2 Denio, 461.

"But whether an action would or would not lie when the mariners of one vessel can escape only by cutting the cable of another vessel, and do so, the question here is whether the law of general average extends to a case where the cable of a vessel is cut by its crew to prevent an apprehended collision with another vessel. I am not aware that the right of contribution has ever been extended beyond those who voluntarily embarked in a common adventure. Very eminent writers upon maritime law have considered that the right grows out of and depends upon a contract implied by law from the relation created by the contract of affreightment. Such is the opinion of Pothier, *Traite des contrat de louages Mar*. pt. 2; Art. of Pardessus, Droit Com. pt. 3, tit. 4, c. 4, par. 2. Chief Justice PARSONS declares, in *Whitteridge* v. *Norris*, 6 Mass. 131, that the requisites to a case of general average are a contract by which distinct properties of several persons become exposed to a common peril, and a relief from that peril at the expense of one or more of those concerned, who thereupon are entitled to a contribution from the rest. And in the case of *Dupont* v. *Vance*, 19 How. 162, as well as in *Lawrence* v. *Minturn*, 17 How. 109, it will be found that the supreme court considered that the master, in case of necessary voluntary sacrifice to escape peril, was acting as the authorized agent of all concerned in the common adventure, and so bound all by his act,—a principle which could hardly apply between mere strangers. I

have on a former occasion declared that I did not consider the right to recover a general average contribution arises from a contract, (*Sturgis* v. *Cary*, 2 Curt. C. C. 384,) but from a principle of natural justice, that they who have received a common benefit from a sacrifice voluntarily made by one engaged in a common adventure, should unite to make good the loss which that sacrifice occasioned. But I have never entertained a doubt that, from the relation of the parties to a common adventure, the law would imply a contract for the purpose of a remedy. Nor did I then suppose that it would be implied between strangers, who were not united in a common adventure by one or more contracts of affreightment.

"The ancient as well as the modern code of sea laws proceeds upon the assumption that the master, representing all the aggregate interests by holding the office, has the rightful power to judge upon the sacrifice of one of the interests which he thus represented for the benefit of the others. But they afford no ground for the position that he may judge for mere strangers, whose property has not been confided to his care. In my opinion the only subjects bound to make contribution are those which are united together in a common adventure, and placed under the charge of the master of the vessel, with the authority to act in emergencies as the agent of all concerned, and which are relieved from a common peril by a voluntary sacrifice made of one of those subjects. Consequently, I must reject the claim for general average."

The decree of the district court was therefore reversed, but it was further stated in the opinion that the questions were so novel, and attended with so much difficulty, and the equitable considerations in favor of some of the claims were such, that it was not thought fit to charge the appellees with costs.

But the elements wanting to constitute a valid claim for a contribution in general average in the case of *The John Perkins*, seem to be present in the case of this appeal. Here the propeller and the barges were not strangers. They were bound together by the contract of towage. They were interested together in a common adventure. They were engaged to and with each other for the entire voyage, and each interested in its successful issue, as the freight earned by each barge was to be shared between it and the propeller as a compensation for its service. The barges were dependent altogether upon the propeller for motive power, neither of them having any means of self-propulsion. They were powerless for any purposes of navigation, and could only by means of a single sail, ground tackle, and steering apparatus, co-operate with the propeller in its control over them. Each barge, indeed, had its own master and crew, but they had no voice in the management of the propeller, nor in the conduct of their own craft, except in obedience to signals from the propeller. The master of the propeller had charge of the navigation of the whole tow for the voyage, and for the purposes of that navigation and to meet its exigencies was invested with authority to act for all. No ingredient required by the rule to constitute a case for contribution in general average seems to be lacking. There is a common adventure, in which distinct interests are associated by a maritime contract, by which the whole is placed in charge of a common agent authorized

to act for all in its prosecution; and, by his authority, a sacrifice is made of part, in the presence of imminent peril, threatening the loss of all, which results in the safety of the remainder.

What is there in the circumstances and nature of the case to prevent the application of the law of general average? It is suggested that the obligation to make contribution in such a case is inconsistent with the contract of towage, which alone established the relation between the parties, and must regulate their relation, rights, and duties. The contract of towage undoubtedly does not embrace any stipulation which requires such a contribution. The towing vessel is not subject to liabilities as extensive as those of a common carrier of goods. It discharges its whole duty by the performance of the stipulated service with ordinary care and skill. It insures nothing. And it is excused from the further performance of its contract when that becomes inconsistent with its own safety. All that is certainly true. It was no breach of its contract, as has already been admitted in this cause, for the propeller, under the circumstances of necessity into which, with its tow, it was driven, without its fault, to save itself at the expense of the barges, which were cut loose and cast away upon the rocks and beach. But the case is precisely the same when jettison is made of a part or the whole of the cargo. The sacrifice is not a breach of the contract of the common carrier, but puts an end to it, and is justified by the law, notwithstanding the obligation of the contract of carriage. But the contribution is not the less on that account exacted upon principles of equity. In neither case does the duty to equalize the loss grow out of the contract. In both, it grows out of the relation established by the contract; and that relation, so far as that duty is concerned, is in substance the same in both cases.

Whether the facts necessary in law to bring the case within the rule, as stated, would exist in every case of towage, or in those cases where the towage is of the more usual kind, it is not necessary to consider or decide. The judicial result in the present case is predicated as flowing from the relation of the parties, as founded upon their actual agreement, and the particular circumstances which arose in the course of its execution. The relation between the parties to a contract of towage will vary according to the terms of the contract, and the liability of each party to the other, as well as to third persons, may be very different in different cases. In a case of collision (*Sturges* v. *Boyer*, 24 How. 110, 122) it was said by the supreme court that—

"Whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary, or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels, must, under such circumstances, look to the tug, her master or owners, for the recompense which

they are entitled to claim for any injuries that vessels or cargo may receive by such means. Assuming that the tug is a suitable vessel, properly manned and equipped for the undertaking, so that no degree of negligence can attach to the owners of the tow on the ground that the motive power employed by them was in an unseaworthy condition, and the tow, under the circumstances supposed, is no more responsible for the consequences of a collision than so much freight; and it is not perceived that it can make any difference in that behalf that a part or even the whole of the officers and crew of the tow are on board, provided it clearly appears that the tug was a seaworthy vessel, properly manned and equipped for the enterprise, and, from the nature of the undertaking and the usual course of conducting it, the master and crew of the tow were not expected to participate in the navigation of the vessel, and were not guilty of any negligence or omission of duty by refraining from such participation."

In like manner, in such a case, the master of the towing vessel commands and directs, not only his own but the vessels in tow, as though all together constituted but one ship; the tow is intrusted to his care, bound to obey his commands and directions, and subject to his power as though it was mere freight. I am unable to perceive why, in such a case, of which the present is an instance, the law of general average should not and does not apply. The novelty of its application in such circumstances is the strongest ground for rejecting it; but, where the principle plainly includes it, that argument ought not to prevail. The history of the development of the maritime and admiralty jurisdiction in this country is not without the occasional surprise of new discoveries. It was a long time, indeed, before the professional mind of the country accepted the idea that the great rivers and lakes, however navigated in fact, were legally navigable where the tide did not ebb and flow; and the doctrine of *Dupont* v. *Vance*, 19 How. 162, by which a maritime lien enforceable in admiralty was recognized in favor of a claim for general average, by reason of jettison of cargo, was thought to be an innovation upon the English rule, which confined the remedy to an action of *assumpsit* in the courts of common law, or by bill in equity in the court of chancery.

Contracts of towage, like that in the present case, are exceptional, and of comparatively recent origin, peculiar, perhaps, to lake and river navigation. They certainly differ very essentially from the ordinary and usual towing contracts for towing vessels into and out of port, or for short distances in narrow and tortuous channels. It was in reference to one of such that Sir ROBERT PHILLIMORE spoke in *The I. C. Potter*, L. R. 3 Adm. & Ecc. 292, where the service to be rendered was defined and limited and for a customary fixed price, and where it was held that, even without formally abandoning the contract, the towing vessel—circumstances of serious danger having supervened, not in contemplation of the parties to the contract—was entitled to salvage reward for bringing her tow safely into port, on the ground that she would have been justified in deserting her. The circumstances of the present case preclude the application of any such principle; for, in regard to craft, such as the barges which constituted

the tow, it cannot be supposed that it was contemplated by the parties that in any emergency they could take care of themselves. The contract in the present case was for the whole voyage, in view of all its perils and contingencies, and completely identified the propeller with her tow for all the purposes of the enterprise, the success of which the towing vessel itself, as well as the tow, had mutually agreed to share as the sole price to each for their respective contributions to the common interest. The case is more like that of two carriers who combine in a joint service; as, where on land, one furnishes motive power and an artificial highway, as a railroad, charging toll to the other for the vehicle and its contents, being the goods to be carried; or, as in the case of *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, where a steam-boat carried goods for an expressman. At any rate, without undertaking to specify in what manner and in what degree the rights and liabilities of the parties are extended beyond those growing out of the more limited and ordinary contract for a mere towage service by such a contract as that now under consideration, it is sufficient in this case to say that it had the effect to establish such a mutuality of interest in the enterprise as to constitute the towing vessel and her barges in tow a unit for the purposes of the voyage, so far that a voluntary sacrifice by the master in authority over all of a part for the benefit of the remainder thereby saved from destruction by a peril of navigation must be compensated upon the principle of general average.

The decree of the district court is therefore reversed, and a decree will be rendered in favor of the appellants, respectively, in conformity with this opinion; the amount in favor of each to be ascertained by an intermediate reference to a master to state and adjust the proportionate contribution to be recovered against the propeller, upon the principles of a general average, with costs.