## VAN DEN TOORN v. LEEMING et al.

### (Circuit Court of Appeals, Second Circuit. February 23, 1897.)

GENERAL AVERAGE — WHEN ALLOWED — REPAIR OF CRACKED SHAFT — SUBSEQUENT BREAKDOWN.

A steamship bound for New York discovered a crack in her shaft when about 316 miles from Sandy Hook. The shaft was strengthened by bolts, and she proceeded at reduced speed until 16 miles from Sandy Hook, when the shaft broke and greatly damaged the machinery. Contribution was claimed on the ground that the risk to the ship was foreseen, and deliberately undertaken in order to save the ship and cargo the great expense of towage. The evidence showed, however, that, while the officers recognized the possibility of a new breakdown and further damage, they confidently believed that it could be avoided. *Held*, that there was no such voluntary sacrifice of the ship to save cargo as was necessary to make a case of general average. 70 Fed. 251, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel in personam by William H. Van Den Toorn, as agent and trustee, against Thomas Leeming and another, to enforce contribution in general average from defendants as consignees of certain cargo shipped on board the steamship Schiedam. The district court rejected the main item of damage for which contribution was claimed (70 Fed. 251), and the libelant has appealed.

Harrington Putnam, for libelant.

Clifford A. Hand, for respondent.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The libelant, in behalf of the steamship Schiedam, filed a libel to recover from the respondents $1,-

158.90, as the contribution from their part of the cargo for general average expenses incurred by the ship. The district court decreed payment of $181.21, which was the amount admitted to be due after the rejection of the damages which were held not to be properly included in general average. From this decree the libelants appealed.

The facts of the case are succinctly stated by the judge of the district court, as follows:

"The above libel was filed to enforce the payment of general average contribution against one of the consignees of cargo on board the steamship Schiedam, which arrived in this port from Rotterdam on July 14, 1891. When 316 miles to the eastward of Sandy Hook, on the evening of July 10th, between half past 7 and 8 o'clock, a crack 18 inches long was discovered on one side of the main shaft, mostly inside of the after bearing, and about 2 feet from the crank. This was temporarily repaired during the 24 hours following by drilling the shaft, which was 14½ inches in diameter, and inserting two iron bolts, 11 inches long and 1⅜ inches in diameter, across the line of the crack. The ship then proceeded on her voyage at about three-fourths of full speed (making 37 or 38 revolutions per minute, instead of 50 to 52, full speed), without interruption, for 38½ hours, to within about 16 miles of Sandy Hook Lightship, when, after having thus made about 300 miles, the shaft suddenly broke wholly off at about 10 a. m. of July 13th, at the original place of fracture. The fractured parts, riding each other, carried away the bearings, damaged the bed plate and channel way, and did much other injury to the machinery. At about 2 p. m. of the same day the ship was taken in tow by a tug, and reached Quarantine, at Staten Island, at 9 p. m. For this latter service $1,000 was allowed as salvage compensation. The Schiedam, 48 Fed. 923. A general average account was afterwards adjusted, amounting in all to $17,508.65. In this charge was included, not only the expense of the towage last named, with other items concerning which there is but slight difference, but also charges to the amount of about $13,000 on account of the damage done to the vessel and machinery by the last violent breakdown of the shaft. No charge was made for the cracked shaft itself, nor for any injury supposed to have been done to the bearings before the repair to the shaft was made."

The only matter in controversy was the liability of the cargo to pay its proportional part of the damage to the ship which resulted from the final break of the shaft. The claim for general average was founded upon the alleged fact that the risk of a great injury to the vessel was foreseen, and was deliberately undertaken in order to protect the cargo and ship from the large salvage expenses which would be incurred if towage was accepted as an alternative, and that thus the consequences of the final breakdown were a sacrifice voluntarily undertaken for the benefit of cargo and vessel.

The principles which are at the foundation of general average were elaborately discussed before the supreme court in the cases of Barnard v. Adams, 10 How. 270; Dupont de Nemours v. Vance, 19 How. 162; and in The Star of Hope, 9 Wall. 203. In the first-named case, the court announced, with precision, the three things which must concur "in order to constitute a case for general average," which can be summarized as follows: (1) A common, imminent danger, to be overcome by voluntarily incurring the loss of a portion of the whole to save the remainder; (2) a voluntary casting away of some portion of the joint concern for the purpose of saving the residue; (3) the attempt must be successful. The controversy in this case is not in regard to the principles which are applicable to it, but it is whether the facts are those which ought to exist in order to create a case for general average. We say "ought to exist," for it is worthy of

note that the tendency of modern adjustments is to enlarge the boundaries of expenses which are included in the adjustment. The question of fact is whether there was, at the time of the repair of the shaft and the decision to proceed to New York under the vessel's steam, a voluntary, expected sacrifice of anything; whether there was even a decision to enter upon a peril to the ship; or whether it was the usual case of repair, in the belief that the port of destination, 316 miles distant, could be reached in safety. Upon this point we fully concur in the conclusion of the district judge that:

"The evidence going to show any expected sacrifice on the part of the ship, or an expectation of such damage as actually happened, is not as strong or as convincing as is stated in the libelant's argument. The evidence hardly shows more than the recognition of a possibility of injury, but with a confident expectation that any breakdown would be avoided."

The testimony of the chief engineer, who was, presumably, the officer most conversant with machinery, is significant. In reply to the question by the counsel for the libelant, "Why was it that you decided to make these unusual repairs, and take these risks of proceeding under your own steam, instead of taking a tow?" he said: "In the first place, I knew that I could make the repairs, and that it could do the work, as was evident by its going 300 miles. And, in the second place, it was for the purpose of saving the expense of being towed." Both the captain and the engineer knew the possibility of a new breakdown, and the probabilities of further damage if the renewed break occurred; but that their decision amounted to a determination to sacrifice the vessel, if need be, in order to save towage, does not seem to have occurred to them. The efficiency of the repairs was not as lasting as the engineer expected, for an injury to the ship subsequently happened; but this unsuccessful result does not entitle the ship to classify the use of the machinery and its injury, after a repair which was entered upon without foreboding, as a voluntary sacrifice for the purpose of rescue from a common danger. Our attention has been called to the provisions of the seventh York Antwerp rule, as indicating the recognition of the principle that the damages to the machinery of the Schiedam should be allowed. The rule is as follows:

"Damage caused to machinery and boilers of a ship, which is ashore and in a position of peril, in endeavoring to refloat, shall be allowed in general average, when shown to have arisen from an actual intention to float the ship for the common safety at the risk of such damage."

The circumstances to which that rule is limited did not exist in this case. The decree of the district court is affirmed, with costs.