## THE EUGENIA J. DIACAKIS.

District Court, S. D. New York. January 20, 1923.

**1. Shipping ⟨⟩190—Recovery may be allowed in general average, notwithstanding libel is grounded on unseaworthiness and owners' fault.**

Recovery may be allowed in general average, though the libel is grounded on unseaworthiness and fault of owners.

**2. Shipping ⟨⟩200—Damage to shipment held, under evidence, due to general average act.**

Damage to shipment of onions from moisture on a voyage across the Atlantic *held*, under the evidence, to have been due to flooding a part of the ship at Gibraltar to extinguish a fire, and to give right of recovery in general average.

In Admiralty. Suit against the steamship Eugenia J. Diacakis, her engines, boilers, etc. Decree for libelant.

Forrest E. Single, of New York City, for libelant.

Homer L. Loomis, of New York City, for claimant.

L. HAND, District Judge. The libel in this case was in general form, and alleged only that the cargo had been delivered to the steamer under a bill of lading and had been turned out in damaged condition, due to fire and water as the result of unseaworthiness, and of the fault and negligence of the owners. The answer denied the charges of fault, and alleged in the eleventh article that the damage complained of, if any, had been due, among other things, to a fire that burned on board the Diacakis at Gibraltar, and the water used in extinguishing the same.

[1] Upon the trial it appeared that the ship was seaworthy, and that there was no fault in her management, and, as the bill of lading excepted damage of the kind in question, the libelant had no case except under general average. To this obligation alone the claim was therefore resolved. The libelant then moved to amend by adding a second cause of action, resting upon the ship's liability in general average. This I refused to allow, although under the very liberal power of a court of admiralty this, perhaps, would have been permissible. I did so because I thought the case of Dupont de Nemours v. Vance, 19 How. 162, 15 L. Ed. 584, directly covered the situation at bar. There the libel was in general form, as here, except that it did not allege any fault in the ship, but depended upon the general liability for nondelivery. The answer in that case had set up a necessary jettison, and this the court thought sufficient to allow a recovery in general average under the implied promise to pay, though that was technically different from the promise on the face of the bill of lading.

The only difference between that case and the case at bar is that here the libelant chose to introduce some allegations of fault on the part of the ship. These may be taken as surplusage, and, if, were they absent, the libelant might recover under general average, the same rule should be applied notwithstanding their presence. In either case the recovery is not strictly in accordance with the allegations, for the libelant has made his case on the bill of lading and recovers upon the implied promise to share in a sacrifice made for the benefit of all.

[2] This being so, I am free to decide the case upon the merits. It is conceded by both sides that the extinction of the fire by pumping on the 26th, 27th, and 28th of October was a general average act, and to any damage resulting to the cargo from it the hull and other cargo must contribute. The case would therefore be simple, except for the fact that the claimant insists the damages did not arise from that cause. At the discharge in December it was found that all the onions had been seriously damaged by sea water or excessive sweat, or both, and that those in hold No. 2 had also been damaged by fire. The position of the claimant was that the general sweating of the ship would have ruined the onions in holds 1, 3, and 4, regardless of the water pumped in, and therefore the general average act was not the cause of loss.

As to the cargo in hold No. 2, it argued that, because the cargo in holds 1, 3, and 4 would have been ruined by general sweat, so would that in hold No. 2. As to this there should be no general average, since the relevant date in such cases is the condition of the cargo at the outturn. The case, therefore, raises the single question of fact as to what caused the damage in question.

It was conceded by all the witnesses who had a chance to observe the discharge that at that time nearly all the onions were either thoroughly wet or moist. The witnesses differ somewhat in their account of the degree of this, but there cannot be any doubt that the loss, which was substantially entire, was due to moisture of one sort or another, and the issue turns upon how far the wetting is to be attributed to the water pumped in at Gibraltar and how far to independent causes. I think it safe to start with the assumption that a cargo of onions alone will not of itself sweat heavily. Several of the witnesses were very positive upon that point, and none of

them disputed it. It is true that, when stowed with figs, dates, or other fruits or vegetables, a cargo of onions at times will be injured by moisture; but from an onion itself, although, of course, it contains water, water cannot be evaported in great quantity. The sweat in the hold, which was very excessive, must, I think, have come from other sources.

It is perhaps conceivable that, if the hatches had been repeatedly opened in warm, moist air, then closed down, and the hull cooled off, and if this had been repeated many times, the holds, when the hatches eventually were broached, might have shown such a condition as was discovered; but these conditions did not exist. The hatches were kept open, it is true, across the Atlantic whenever the weather permitted; but this was not very often, as the weather was severe and the seas heavy, and there was presumably no warm weather. Besides, when opened on the way over, the hatches steamed in clouds, showing that there was a continuous evaporation in the holds. Where, then, did this water come from?

It is easy to see how the cargo in holds 1 and 2 may have been spoiled. To extinguish the fire it was found necessary to flood hold No. 2 up to the 'tween decks, and all the cargo must have been thoroughly soaked. A part, but not all, of this cargo was discharged at Gibraltar, of which the greater part was restowed—how far dried out does not appear. That which was not taken out remained wet, and, together with what was restowed, formed an ample reservoir of water from which the air of the hold could alternately take up and discharge moisture with any changes in the outer temperature. Thus that water which was originally contained in perhaps only a part of the onions in this hold could be spread over all, and produce just those results which the outturn disclosed.

This, furthermore, would not be limited to the cargo in hold No. 2 alone, for there was no bulkhead in the 'tween decks between 1 and 2, and for this purpose the whole forward part of the ship was but one compartment. This is true, even though no salt water reached hold No. 1 at all. As to whether there were any onions directly damaged by sea water in that hold, the testimony is in conflict, as is the case as respects holds 3 and 4 as well; but it is not necessary to suppose that sea water entered hold No. 1 above the tank tops. That it might is reasonable enough, for on the balance of proof it seems to me likely that there were no sluice

valves in the limbers which led between the two holds. Indeed, the testimony of the crew admits that there was at least one foot of water in the forward hold. There seems to me, therefore, every reason to suppose that the damage in hold No. 1 was due to the general average act.

The case is much more difficult as regards holds 3 and 4, not only because of the direct testimony of the master and crew that substantially no water entered those holds (not more than six inches), but because it is not at first blush obvious how the water in the fore part of the ship could have passed abaft the engine room. Nevertheless, the condition of the cargo in these holds at the outturn was not substantially different from that in the forward part, and the testimony of some of the witnesses is that there was direct sea water damage there, as well as in the forward compartment.

The question, therefore, seems to me to resolve itself into whether it was possible that the flooding of the fore part of the ship might have flooded the bottom of holds 3 and 4. It seems to me not impossible that this should have been the case. The master and crew say that water entered the engine room and rose to the level of the lower boiler. This is three or four feet above the tank tops. If so, the sluice valve in the bulkhead between hold 2 and the engine room must have been open. It is obvious that no fires could have been kept in the lower boiler after that happened. The donkey boiler, which is forward of the main boiler, is somewhat higher, just how far I do not find in the testimony. But McNaught's testimony shows that it would have been very difficult, if not impossible, to keep any fire in the donkey boiler when the vessel was much by the head.

If the whole of hold No. 2 was flooded up to the 'tween decks, the vessel must have been by the head, especially if there was no pump in hold No. 1 to keep down the water. I am disposed to think that there were no such pumps either in hold No. 1 or No. 4. Haight, called by the claimant, said he never saw such an equipment on an old ship, and the experts for the libelants concur with him in this. If there was no pump in hold No. 1, the water must have flowed through the limbers into the forward cargo and carried down the bows of the ship much deeper than the stern. Indeed, she was beached, and her after tanks filled, to counteract just this. I therefore think it not at all improbable that the fires of the donkey boiler, as well as the lower boiler, had been extinguished.

I have, then, to imagine a ship in which

there was between three and four feet of water in the engine room. Between that compartment and hold No. 3 there was a sluice valve, as there was in the forward bulkhead of the engine room, and, if that were closed tight, no water could enter. But we know that it was not quite tight, because the crew admits that at least six inches came into the bilges. When faced with the fact that the sweated condition of the cargo in the after holds was substantially the same as that in the fore hold, there seems to be every probability that more water entered the after compartments than the crew is willing now to admit.

I can see no other reasonable explanation for the turnout in that part of the ship. It is not necessary to assume that the water rose any higher in those holds than it did in the engine room. If only the lower tiers of onions in holds 3 and 4 had been soaked to a depth of three feet above the tanks tops, for a period of two or three days, the same phenomenon would have appeared as did in the fore part. The ship remained for three weeks in the port of Gibraltar, and then took to the cold waters of the Atlantic. The evaporation from the soaked cases at the bottom would have filled the whole after compartments with a moist vapor, which in turn would condense and drip upon all the cases.

Considering, therefore, the balance of probabilities, it seems to me that the libelants have succeeded in showing that the damage done was due to the influx of sea water into all the holds, and, if so, they have made out their case, not only as to holds 1, 3, and 4, but as to the cargo in hold No. 2, for, if it was not the necessary incidents of the voyage which destroyed the onions, it was the general average act.

There is another possible aspect of the case, which I do not find it necessary to determine. Suppose that the sweat was due to the moisture carried by the air in Gibraltar. The ship lay there, as I have said, for three weeks. If it was the warm, moist air of that port which filled the holds, and which afterwards condensed upon the Atlantic, there could be a strong case made for saying that, nevertheless, the loss was a direct consequence of the general average act. The delay until November 13th, when the ship was arrested at Gibraltar, was due to the necessity of discharging and reloading the damaged cargo, and this was a consequence of the flooding of the hold. If it was that delay which permitted the cargo to become so wet with moist air, was it not a di-

rect consequence in law of the act itself? I need not, however, decide that question, for I am satisfied upon the balance of the proof that it was the sea water pumped in to extinguish the fire that did the damage.

Therefore the libelant may take an interlocutory decree against the ship, directing her to make a general average adjustment, which had better be done by some professional adjuster, whom, if the parties cannot agree, I will make special commissioner.