## THE E. A. PACKER.

*(District Court, S. D. New York.   May 8, 1884.)*

**1. COLLISION—LOCAL STATUTES—PROXIMATE CAUSE.**

Where both steam-tugs were navigating in violation of local statutes, but there was plenty of time and space to avoid each other, the breach of the statute was *held* immaterial, as not a fault proximately contributing to the collision.

**2. SAME—ROUNDING BATTERY—USAGE.**

Where a tug with a tow is rounding the Battery within the eddy, and within 300 or 400 feet of the shore, another tug with a tow upon a hawser, coming down and crossing with the ebb-tide, has no right to cross the bow of the former in order to run between her and the New York shore, both from the inherent danger of such a maneuver, and the established usage of boatmen to the contrary in rounding the Battery.

**3. SAME—CASE STATED.**

Where the tug E. A. P., with a tow lashed upon her port side, was rounding the Battery and going up the East river, the tide being strong ebb, and she was proceeding in the eddy, about 300 or 400 feet off the barge office, when the tug W., with the barge A. in tow upon a hawser of 20 fathoms, was seen coming down and across the East river from the direction of Roberts' stores, about 500 or 600 yards distant, and the E. A. P., being headed somewhat towards the New York shore, gave two whistles and put her helm to starboard, and the W. ported her helm and gave a strong sheer also towards the New York shore, in order to run inside the E. A. P., and the latter then stopped and backed, but the W., keeping on at full speed, crossed the bows of the E. A. P., but brought her barge into collision with the latter's tow, and the evidence being exceedingly conflicting as to the relative positions and bearings of the two tugs when first seen, *held*, that the W., when first seen, was on the E. A. P.'s starboard hand, about one-third the distance to the Brooklyn shore, and much further out in the stream than the E. A. P.; that the latter, before

the W.'s sheer to starboard, was nearly directly ahead of the W.; that, under the peculiar circumstances of navigation about the Battery, the exceptions in the inspector's rules, as well as under statutory rule 24, and the established local usage of boatmen, it was the duty of the W. to pass outside of the E. A. P. in accordance with the two whistles of the latter; that she had no right to cross the E. A. P.'s course near the shore; and that the latter was without fault and the W. solely responsible for the collision.

In Admiralty.

*Benedict, Taft & Benedict,* for libelants.

*E. D. McCarthy,* for claimants.

BROWN, J. The libel in this case was filed to recover damages for the loss of the barge Atlanta, which was sunk in a collision with a boat in tow of the E. A. Packer, upon her port side, at about 4 o'clock in the afternoon of October 25, 1880, off pier 1 or 2, in the East river. The Atlanta had been lying at Roberts' stores, three piers above the Wall-street ferry on the Brooklyn side. She was taken in tow by the steam-tug Wolverton, on a hawser of about 20 fathoms, and was bound up the North river. The tide was about half ebb, and strong. The Wolverton, after hauling the Atlanta away from the dock at Roberts' stores, and getting straightened down the East river, was put upon a course heading down and somewhat across the East river, towards a point a little below Communipaw, on the Jersey side, and so as to clear pier 1, according to the testimony of Schultz, her pilot, by about 600 feet, and the battery by about 700 feet. Schultz further testifies that this course was kept unchanged until he heard two whistles from the Packer, when he put his helm hard a-port, and changed his course some four or five points, heading in towards the New York shore. The Packer was also headed somewhat towards the same shore. The Wolverton crossed the bows of the Packer, clearing her by some 12 or 15 feet; but the Atlanta, which was about 100 feet astern, was struck just forward of amid-ships on her port side by the tow of the Packer, and speedily sank. Upon a libel filed in the district court of the Eastern district of Pennsylvania against the Wolverton by the master of the Packer's tow, to recover her damages arising out of this collision, it was contended, on the part of the Wolverton, that the two tugs approached each other port to port; that is to say, that the Packer was outside, and further off from the New York shore than the Wolverton, and that the two were upon courses which, if kept, would have cleared each other by the Packer's going astern of the Wolverton. The libel in that case was dismissed on the ground, as I understand, that this theory of approach was not disproved. *The Wolverton,* 13 FED. REP. 44. By the undeniable weight of evidence in this case that theory is untenable, and is proved to be untrue. Of all the witnesses on both sides, Capt. Schultz alone maintains it. It is clearly inconsistent with the situation as indubitably established by other proof, and is substantially abandoned by the libelants' counsel.

For the claimants, it is contended that the two tugs, at the time

when they were first seen to each other and when the first signal of two whistles was given by the Packer, were approaching each other starboard to starboard; that is, that the Packer was heading up the East river in the eddy off the barge office, and then being within 200 to 400 feet of the New York shore, while the Wolverton was much further out in the river, headed somewhat quartering across the river, but still downwards and outside of the Packer. The libelants' counsel, though not denying that the weight of evidence shows that the Packer had the Wolverton on her own starboard bow, still contends that the Wolverton had the Packer on her port bow, and that the Wolverton had, therefore, the right of way, and that the Packer was bound to keep out of the way. The testimony on this point is more than usually embarrassing; not merely from the contradiction between different witnesses, but from the inconsistencies, contradictions, and corrections by several of the most important witnesses on each side, in their own testimony. It would not be profitable to point these out in detail; both counsel have sufficiently commented upon them. Almost any theory of the case can be maintained by taking detached portions of the testimony. I shall state only some of the points which I think best established.

1. Both the tugs were navigating in violation of the statutes of this state in passing so near to the Battery; but as they were visible to each other in ample season to avoid the collision, and as there was plenty of room for them to avoid each other where they were, the violation of the statute is not deemed a proximate cause of the accident, and is therefore regarded as immaterial. *The Maryland*, 19 FED. REP. 551, 556; *The Fanita*, 8 Ben. 11.

2. The collision took place between piers 1 and 2, and probably not over 300 feet off from the latter.

3. The Packer, with a heavy tow on her port side, had come down the North river, and rounded within 300 or 400 feet of the Battery, and probably less than that distance, according to the prevailing custom of boatmen, in order to avail herself of the eddy there; intending to pass through this eddy, and to keep close in by the piers beyond. She passed the barge office, probably within 400 feet of it, under a starboard wheel, so as to keep along by the piers, and so as to draw nearer to the longer piers beyond. She was moving slowly, at the rate of not more than a couple of miles per hour by land; while the Wolverton, with a strong ebb-tide, was moving by land at about the rate of eight miles per hour. The two tugs were seen by each other, according to the testimony of the pilots of each, when about 400 or 500 yards apart. Before the collision the Packer's engines were reversed; and, at the time of the collision, she was not probably making any headway. The distance of 400 or 500 yards between the two, when first seen, would be passed over in about a minute and a half. During that time the Packer, considering her slow motion and the backing of her engines, during the latter part of this inter-

val, could scarcely have made more than about 300 feet progress; and this agrees with her evidence as to the place from which she first saw the Wolverton, viz., off the barge office. The Wolverton did not back at all, but kept on at full speed; and she must have gone, during the same time, from 900 to 1,200 feet.

4. In reaching the point of collision from the place where she first saw the Wolverton, it is clear that the Packer could not have much shortened her distance from the New York shore; both because she could not have gone much over 300 feet altogether during the interval, and because, in the edge of the slack water, where she then was, the slight ebb-tide against her operated to lessen the effect of her starboard wheel. The libelants' counsel contends, even, that through this effect of the ebb-tide she was actually headed outwards and away from the shore. This does not accord with the evidence, and does not seem to me probable; several of the libelants' own witnesses testified to the Packer's heading in somewhat towards the New York shore. At most, however, the Packer, in passing over some 300 feet, could have neared the New York shore but little, although, in approaching pier 2, she would come much nearer to it than to pier 1, as pier 2 projects about 75 or 100 feet further out into the water.

5. On the other hand, it is certain, from the testimony of the witnesses on both sides, that the Wolverton, when the Packer was first seen, about 400 or 500 yards distant, must have been far out in the East river, at least one-third of the distance to the Brooklyn shore, and in the full sweep of the ebb-tide. That distance back from the place of collision would place her there.

6. The Wolverton's course, as given by her pilot and wheelsman, would carry her outside of the Packer's line of approach, making them starboard to starboard when first seen. Considering the gross error of the pilot, Schultz, in testifying that the Packer, when first seen, was further out in the river than the Wolverton, that the tugs approached port to port, and that the Packer seemed to have come from the vicinity of Bedloe's island, and not around the Battery, I attach little weight to his evidence on these disputed points. It is not impossible that in his testimony he has confounded the situation of the Packer with that of another tug outside of her; that it was not the Packer which he saw 400 or 500 yards distant, but the other tug more in the direction of Bedloe's island; and that he did not see the Packer till afterwards, when she was much nearer to him. But there is no reason to discredit his testimony as to the course which he took and kept up to the time of his "rank sheer," after the Packer's whistles. That course, he says, was headed for "a little below Communipaw," after straightening down the river from Roberts' stores. From that point, after straightening down the river, the course testified to so as to "clear the Battery by some 700 feet" would have brought the Packer upon the Wolverton's starboard bow, unless the Packer were more than 500 feet off from the barge office, which was not the case, as

the place of collision proves. The Wolverton reached the place of collision only after a sheer of four to five points. She passed the Packer's tow only about 20 feet off, and I regard it as in the highest degree improbable, therefore, when the Packer was first seen, or ought to have been seen, *i. e.*, before the Wolverton ported, that the Packer was to any appreciable extent on the Wolverton's port bow. She must have been either on the Wolverton's starboard bow or nearly ahead, as several of the witnesses testify. Schultz's testimony, that the Packer was at no time on his starboard bow, cannot be true. If he ported to go to the right of the other tug above referred to before seeing the Packer, that would explain some of his testimony, though it would introduce other contradictions.

7. Much of the contradiction in the testimony may be explained by the different times at which the observations of the witnesses may have been made. There is no question that after the Wolverton made her sheer towards the New York shore, she had the Packer upon her own port bow. Several of the witnesses who testified, including the wheelsman of the Wolverton and of the Atlanta, did not see the Packer until after this sheer was made. Their evidence on this point is therefore irrelevant. I do not mean to say that all of the evidence on the part of the libelants can be harmonized in this way; plainly it cannot be.

8. The cause of the collision, in my judgment, was the determination of Capt. Schultz, of the Wolverton, to run into the eddy ahead of the Packer, and between her and the New York shore, instead of keeping his former course and passing outside of and astern of the Packer, as that course would have carried him, had the Packer been allowed to keep on under her starboard wheel. The testimony of the libelants' witnesses, as to having the Packer two or three points on their port bow, is, I think, founded upon the picture in their minds of the situation after it became noticeable and dangerous, through the sheer given by the Wolverton in order to get into the eddy across the Packer's bows.

9. Assuming that the Wolverton had the Packer either directly ahead, or even a little on her own port bow, before she ported her wheel, I am of opinion that, under the peculiar circumstances of navigation around the Battery, the pilot of the Wolverton had no right to attempt to go inside the Packer as he did, or to change her course to starboard; and that the Packer, being in the slack water when first seen, and near to the shore, far inside of the Wolverton, had a right to retain that position as respects the Wolverton, and properly kept to port under a starboard wheel, with a signal of two whistles; and that her subsequent conduct was without fault. The Wolverton, in crossing the river and attempting to run across the tide into the eddy between the Packer and the New York shore, would necessarily cause her tow, astern on a hawser, to swing round outwards with the tide, and present a longer front to boats coming in the opposite direction. Such a maneuver would evidently be very hazardous to her tow, ren-

dering it difficult, if not impossible, for the Packer to escape her. The Packer might, it is true, on first seeing the Wolverton, have gone right out from the eddy into the East river tide, and thus have got round the Atlanta; but the tide, in that case, would have swept her round and far astern of her course. The custom of navigation about the Battery has determined against any such unnecessary and unreasonable navigation as that, on the part of a tug which is already in the eddy, going eastward near the shore. The evidence shows clearly, in my judgment, that the prevailing custom in navigating around the Battery on the ebb-tide, where a tug and tow are going eastward in the slack water near the barge office, and another tug, with a tow on a hawser, is coming down the East river and bound up the North river, but much further out in the stream, requires the latter to keep off from the former, and not to attempt to run between the former and the shore, in order to get into the eddy, but to go outside and astern of the other tug. The libelants' witnesses do say that it is customary for tugs going either way to hug the shore; but none of them assert that, in the situation of the two tugs, as above described, and as I have found it, the Wolverton could properly endeavor to run in near shore as she did; while several of them, and all of the respondents' witnesses, justify the Packer in her course under the situation described. This usage is founded upon the manifest considerations of prudence and convenience above stated. This usage must have been known to the pilot of the Wolverton. The statute did not entitle him to run towards the shore inside of the Packer as he did, but forbade it; and the settled usage, as well as the most obvious prudence, also forbade it. The pilot of the Packer, being already very near the shore when the Wolverton was sighted, had a right to rely upon the Wolverton's observing this usage, under the peculiarities of navigation around the Battery. Being near the shore, it was his duty to keep there, and to navigate precisely as he did; giving, as he did give, the appropriate signals of two whistles. The ordinary rules of navigation do not apply to such a case; it falls within statute rule 24, and the exceptions to the inspectors' rules, (page 38,) which for good reason permit going to the left, and require the other vessel to navigate accordingly. The circumstances here did furnish good reason for going to the left, and justified the Packer's course. The pilot of the Wolverton knew it, or ought to have known it; and he was bound to accept, without hesitation, the first signal of two whistles given by the Packer in time, and to pass to the left, which the result shows he could easily have done. In fact, the testimony of Schultz himself, and the ground upon which he justifies his conduct, serve to confirm the view above taken. He does not claim that he would be justified in running between the Packer and the shore if the Packer were already near the shore, in the eddy, and heading towards the piers; and that is the situation as I find it. His defense is upon the ground that the Packer was, in reality, further out in the stream than the Wolverton, and that the two were approaching port

to port; and that is the claim in the libel; a wholly different situation, which, as I find, the evidence in this case disproves.

10. Nor can I doubt that had the Wolverton merely kept her own course without change the collision would have been avoided. The Atlanta was struck after she had ported her helm and passed some distance on that course. This alone, I think, shows that had the Wolverton and Atlanta kept their previous courses, and allowed the Packer to keep on to port, they would have gone clear to the left. The Packer, in giving two whistles and keeping to the left, had the right to assume that the Wolverton would at least keep her course, and not sheer to the right; but by the Wolverton's porting the Packer was compelled to stop, and the collision was thus brought about. Though the Packer was navigating where she had not by statute any right to be, still this, as I have said, in no way contributed to the collision. The positions of both tugs were perfectly well known to each other in ample season to avoid any collision. The Packer, being near the shore, was navigated according to the prevailing usage, and without any fault that I can perceive. Being near the shore, usage and common prudence required her to keep there, as respects the Wolverton, which was far out in the stream; while the latter was bound by the same usage and prudence to pass outside, without reference to her particular heading in crossing and coming down the river. The collision was, in my judgment, solely the fault of the Wolverton, in persisting in an unauthorized and dangerous attempt, which the Packer could not have anticipated, to run into the eddy between the Packer and the shore. When this was seen to be pertinaciously adhered to on the Wolverton's part, the Packer gave way and endeavored to avoid the collision; but without avail. As I cannot find any fault on her part, the libel must be dismissed, with costs.