THE BENJAMIN FRANKLIN. THE ·EDWIN H. MEAD. THE EMMA J. ROSE.

(Circuit Court of Appeals, Second Circuit. January 16, 1906.)

Nos. 74, 75.

1. COLLISION—NAVIGATION OF NARROW CHANNELS--RULES APPLICABLE TO HUDSON RIVER.

The Hudson river, in the vicinity of Yonkers, where it has a single deep and straight channel for a number of miles, is a "narrow channel," within the meaning of article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring steam vessels in narrow channels, when safe and practicable, to keep to that side of the fairway which lies on their starboard side, and such rule governs its navigation.

2. SAME—STEAMER AND MEETING TOW—VIOLATION OF RULES.

A tug with a tow of 15 boats, coming down the Hudson river, held in fault for a collision, which occurred opposite Yonkers and near the docks on the east side of the river in the evening between one of her tows and a tug passing up, for being on the wrong side of the channel, in violation of article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]); it being shown by her own evidence that the evening was only slightly hazy, which made it safe and practicable for her to keep to the west side of mid channel, and also that she was proceeding on a course angling across

the river, so that her tow occupied a considerable part of the channel and unduly interfered with navigation of ascending vessels.

Appeals from the District Court of the United States for the Southern District of New York.

For opinion below, see 127 Fed. 457.

This cause comes here upon appeals from decrees of the District Court, Southern District of New York, which held the steamtugs Benjamin Franklin and Edwin H. Mead both liable for damages from a collision of the former with the barge Emma J. Rose, in tow of the Mead. The Mead was bound down the Hudson river from Rondout, with 15 boats and barges in tow; the Rose being starboard boat on the hawser tier. The Franklin, which had landed an excursion at Hoboken, was bound up to Yonkers unincumbered. The collision happened between 10 and 11 p. m. July 14, 1901. The district judge found that: "In this case the Franklin was clearly in fault. If there was such a fog that she could not see the lights on the Mead, she was in fault for running at a very high rate of speed in a fog. If, as I think was the truth, the weather was simply hazy, and the lights of the Mead and on her tow could be seen, she was in fault for not seeing them. Her navigation was reckless. * * * I cannot see that the Rose was in fault. * * * She had a light, and it was in a sufficiently correct position." Since the appellant does not dispute the finding as to the Rose, and the Franklin, by not appealing, concedes her own fault, it will not be necessary to enter into the details of the navigation. Such facts as bear on the navigation of the Mead will be stated in the opinion. The opinion below is reported in 127 Fed. 457.

R. D. Benedict, for the Mead.

A. G. Thacher, for the Rose.

James E. Carpenter, for the Franklin.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). The District Court held the Mead in fault for "being on the east side of the river with her tow, in violation of rule 25," which reads as follows:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

This rule, long in force in the regulations governing navigation in the open ocean, was applied to inland waters by Act of June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St 1901, p. 2875]. The question presented on this appeal is whether that part of the Hudson river where this collision and the immediately antecedent navigation took place is a narrow channel, within the meaning of the rule, and its decision is not of such momentous importance as the arguments assume. If the result of an affirmance would be to hold that the Hudson river, from the head of navigation "at the railroad bridge at Troy" (Atlantic Coast Pilot) to the upper bay of New York, is to be considered a single narrow channel, under rule 25, the question would be a very far-reaching one. The testimony—much of it given by men who for years, by day and night, have navigated the big passenger steamboats carrying hundreds of passengers on a single trip, under all conditions of weather—shows that such a finding would revolutionize the navigation of the river. But the situation presented here is a far simpler one. From some miles above Yonkers to some miles below it, the river

runs without a bend and, roughly speaking, about S. S. W. In the vicinity of Yonkers the portion of the river near the west bank is comparatively shallow. It is deep enough to float even the large passenger boats (the Albany draws only seven feet, the Adirondack ten), but of course a moving boat needs plenty of water under her, and for a fast-moving boat there must be a sufficient distance kept from shoal water to guard against the effects of suction and displacement-waves upon vessels moored or berthed at landings near the shore. Moreover, it is not unusual to find a vessel drawing 20 feet of water included in some tow. The District Judge has correctly found that a "safe channel for ordinarily large boats at that point extends from the eastern shore two-thirds of the way across the river." This channel varies from about 2,500 to 3,000 feet, it deepens from 3 to 3½ to 4 fathoms on the west side to 6 to 6½ to 7½ on the east, shoaling again to 5 fathoms near the docks at Yonkers. It will be seen that here we have a single, wide, straight deep-water channel; not the situation presented elsewhere in the river, where two (or more) deep-water channels each navigable by the larger vessels, running generally in the direction of the river's course, are separated by shoaler reaches of water, safely navigable only by vessels of lighter draft. Nor have we the complication presented in The Bee and The Booth (C. C. A.) 138 Fed. 303, where the federal government has designated a part of the natural channel as an anchorage ground. The collision took place above the limits of the port of New York. The pleadings and some of the witnesses state that it took place "below Yonkers"; but the pleader and the witnesses were referring to the riverman's "Yonkers," Yonkers' landing, where the docks of Yonkers are. They were not concerned with the political divisions of the state, nor the geographical boundaries of the city of Yonkers. The overwhelming weight of the evidence shows that it took place within a few hundred feet of the landing at Ludlow, which is within the limits of the city of Yonkers, whose southerly boundary is the northerly line of Mt. St. Vincent (chapter 866, p. 2046, Laws N. Y. 1873). The Topographical Sheet (Tarrytown quadrangle) issued by United States Geological Survey shows the landing place at Ludlow to be over half a mile from the northerly line of Mt. St. Vincent, which is described thereon as the boundary between the counties of Westchester and New York. Therefore the complication presented by the designation of anchorage grounds within the port of New York is not found in the cause at bar.

Is this a "narrow channel," within the meaning of the statute? The Mead has called experienced pilots to testify that navigators on the Hudson river have never considered this part of it a narrow channel. What they considered it before the passage of the act of 1897 is, of course, immaterial. Nor is their present opinion on the question important. It must be assumed that Congress used the phrase "narrow channel" with the meaning which it had acquired by prior decisions of the courts. If that definition fits the Hudson at this part of its course, the new rule must govern, although it may change existing practice and be a shock to the persons who navigate there. The power to regulate rests wholly with Congress. Under the decisions there can

be no doubt that the phrase "narrow channel" correctly describes the channel hereinabove set forth. The leading cases will be found cited in Judge Holt's opinion in The Bee and The Booth (D. C.) 127 Fed. 453. Some effort was made to show that navigation under the rule was wholly impossible; but that failed, because all the witnesses conceded that it was safe and practicable to follow it when the weather was so clear that objects could be plainly distinguished at a considerable distance. We concur therefore with the District Judge in holding that rule 25 governs navigation in that part of the Hudson.

It will be observed, however, that the rule is not of universal application. It is to be followed only when it is safe and practicable to do so. Upon this branch of the case much evidence has been introduced which we find highly persuasive. It appears that vessels which anchor here almost universally select the west side (sometimes quite well over towards midriver), not because that side has been designated by authority, but because it has been the custom for many years, and there is better holding ground. At certain seasons of the year shad poles are to be encountered, and they too are generally on the west side, sometimes running over as far as midriver. There is no testimony as to whether they are lighted or not, and we have found no state statute regulating them, except one which applies solely within the limits of New York. See consolidation act of New York of 1882, Laws 1882, p. 206, c. 410, § 736, a re-enactment of a statute which was originally passed in 1857. It forbids the placing of nets in New York Harbor where the water is more than six feet deep, and seems to be generally disregarded, although it was saved from repeal by the Charter of Greater New York and by the game law of 1892. (Laws 1892, p. 983, c. 488, as amended by Laws 1895, p. 893, c. 974). The west bank is the narrow strand at the foot of the Palisades with very few landings and a few scattered lights, while the east bank is a succession of settlements, many of them populous, so that, as one of the witnesses expresses it, there "is one continuous lighthouse from Yonkers to New York." On the east bank too is the Hudson River Railroad with its constantly moving trains, the sound of which as they enter and leave stations will often be a valuable clue to the listener's whereabouts when thick weather obscures all lights. By listening carefully he can thus determine how far down he is, and, if he is bound for some landing on the east shore, can thus ascertain when he should turn in. No doubt, as the district judge found, a vessel can be run on the Hudson by compass courses without seeing the banks, but the margin of safety, in the case of deviation when running a long course, or when some bend or trend of the river makes it necessary to change course at some point which can only be guessed at upon a calculation of speed and time, is vastly less than it is on the open ocean. We should be inclined to hold on the evidence in this case that a vessel navigating at night in a heavy fog, which passed Kingsland Point Light and the bell there (Tarrytown) near midchannel, and undertook to lay her course down river on the westerly side of midchannel, would find it not practicable to make her turn in at the proper place for a landing at Ludlow or Mt. St. Vincent—without considering the measure of

safety incident to such a course. But all this testimony does not help the Mead. The forest and game law of the state forbids the taking of shad after June 15th from the Hudson below Troy. The evidence shows that by the end of June the shad poles are removed. This collision happened July 14th. The Mead was not bound in for any landings on the east bank, but down into the port of New York. Throughout her navigation, according to her own witnesses, it was "only a little hazy," and "you could see lights on both sides of the river and for some distance." We cannot find that it was either not safe or not practicable for her to navigate in compliance with rule 25, and she was in fault for not obeying it.

The appellant contends further that, even if The Mead was in a part of the channel which was forbidden to her, her position was not the proximate cause of the collision, citing The Fanita, 8 Ben. 17, Fed. Cas. No. 4,635; The Maryland (D. C.) 19 Fed. 551; The E. A. Packer (D. C.) 20 Fed. 327; The Clara, 55 Fed. 1023, 5 C. C. A. 390. Mere presence at the place of collision is not always enough to charge a vessel with fault. Her presence must in some way contribute to the happening of the collision, as, for example, when a vessel in forbidden water has been concealed by fog or by some other vessel and suddenly appears where she was not to be expected, or where the forbidden water is so restricted, or already so incumbered with other craft, that her presence embarrasses the navigation of the other vessel. We think the Mead's disobedience of the rule was such a contributing cause. She was not only east of midchannel, but very far to the east of it; the collision happening close to the dock at Ludlow. Moreover, instead of proceeding straight down the river with her tow in line behind her, she was angling over towards the west, with her tow of 15 boats trailing over towards the east, thus occupying a considerable part of the channel in which the Franklin was navigating, and embarrassing her navigation.

For these reasons, we are of the opinion that the decree of the District Court should be affirmed, with interest and costs.