---

## THE NO. 1.

(Circuit Court of Appeals, Second Circuit. June 14, 1910.)

### No. 243.

1. **COLLISION** (§ 90*)—**RULES TO PREVENT COLLISION—EFFECT OF VIOLATION.**
   Disobedience of Consolidation Act N. Y. (Laws 1882, c. 410) § 757, requiring vessels passing up and down the East River to navigate as near as possible in the center of the river, is not a fault which precludes recovery for an injury, if it was only a condition and not a cause of the injury.
   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 90.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. NAVIGABLE WATERS (§ 23*)—OBSTRUCTION BY VESSEL—LIABILITY FOR IN-
JURY TO ANOTHER VESSEL.

A dredge, while working at a place 140 feet out'from a Long Island
City pier, was moored to the pier by two wire cables stretched above the
water, with nothing to give notice of their presence, except the cables
themselves and a sign on the dredge. to "look out for anchor cables." A
New York City fireboat, attempting to pass between the dredge and pier
in answering a call to a fire, did not see the cables until too late to stop
or avoid them, and was injured by running into them. *Held*, that the
dredge was in fault for not giving a better warning of such an unusual
obstruction, and the fireboat was not chargeable with contributory fault
because she was not in the center of the river, as required of all vessels
by a state statute.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 23.*]

Appeal from the District Court of the United States for the South-
ern District of New York.

Suit in admiralty by the City of New York against the steam dredge
No. 1; S. Pierson & Son, Incorporated, claimant. Decree for libelant,
and claimant appeals. Affirmed.

The following is the opinion of Adams, District Judge, in the court
below:

ADAMS, District Judge. This action is brought by the city of New York
against the steam dredge No. 1 to recover for damages she suffered by rea-
son of a collision with a cable running from the dredge to a dock at the
foot of Flushing street, Brooklyn. The damage was not very great but
there is rather an important principle involved.

The city claims that the dredge was in fault in numerous particulars, one
of which is that a cable was dragged in and out of the water and suddenly
up before their fireboat, but I think the testimony shows rather the contrary.
The testimony from the dredge is very convincing. The witnesses were in-
telligent men and evidently tried to state the truth, therefore I will view the
case from the standpoint of the dredge, as to the facts. These facts seem to
be, according to the dredge, that she was anchored in this place with two
anchors on her port side and one leading astern, and then by two cables
running to Flushing street. A city fireboat, the David A. Boody, was coming
up the river to a fire in the immediate vicinity and one of these two cables
struck her pilothouse, doing some damage, fortunately not very great and
without injuring any persons on board.

It is contended on the part of the dredge that the fireboat should have
gone around the dredge and then into the place for which she was bound to
overcome the fire. It is contended that it would not have taken her more
than a minute longer to do so, but I do not think that fireboats are bound
to go outside of another vessel in order to reach a fire which they can get at
in a more direct way. We all know that a minute or two in a fire is of very
great importance, and it is the duty of a fireboat, to get to the scene of the
fire as soon as she can, without, of course, coming in collision with other ves-
sels. If she had run into the dredge in this case it might have made a case
of fault on the fireboat's part. She did not run into the dredge, but into a
cable which led from the dredge to the wharf, into the down river cable
which, it has been testified, started from a place on the dredge about eighteen
or twenty feet above the water—I am not sure but that it was above the deck,
the dredge probably had three or four or five feet freeboard, so it would have
been higher than seventeen or eighteen feet—and then ran in a pretty straight
line to the pier; that is, the line was straight when the dredge was working
so that the digger was outside of it. But when the digger was on the inside,
the weight deflected the dredge to a certain extent so that the cable, from an
altitude of, say, ten or twelve feet was reduced, at the place of collision, to
five or six feet from the water. This cable was fastened to a vessel which

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was lawfully anchored in that place. The vessel gave warnings of cables generally—she said: "Danger, look out for anchor cables," at least that was the intimation.

It is argued by the city, and I think with great force, that that was no notification to the fireboat which should cause her to look for a cable leading from her upper works to the pier. That warning merely meant to look out for cables leading from the boat under water, not for cables leading in the air. The fireboat saw the warning that was there and perhaps if the warning had been more definite it might have been a notification to her of the existence of this cable in that particular place, running several feet above the water so that it was in danger of striking the pilothouse of the fireboat. The fireboat going along up there was bound, as I have said before, to a fire at a pier which was practically at the stem of the dredge, very little above it perhaps. When she got up near the dredge towards the open space she intended to go through—and properly I think—she did not see this cable until she was within one hundred or one hundred fifty feet of it. She was keeping a lookout, perhaps not as efficient a lookout as we can imagine but an ordinarily good lookout, and this lookout was the first one on the fireboat to see the cable. Its position probably changed the few feet mentioned while he was looking. He notified the men in the wheelhouse and as soon as the notification was received the pilot stopped the fireboat and reversed but it was not enough to enable the boat to avoid the contact. The damage might have been very much greater if the fireboat had been going faster and might have caused great injury to those on board if not, indeed, loss of life.

That brings us back to the question whether the dredge had a right to use her cables to run to the pier in this way. The testimony on her part that she was obliged to use the pier in that way, because there was not space enough between her and the pier to use the same kind of anchor she was using on the other side and astern is probably true. The question is whether the fireboat, coming up, had notice of this cable because the dredge, while she had permission to be in that particular place, was required to use the precautions of ordinary vessels in such a place. She had no right to do things there which other vessels would not be privileged to do. She was entitled to lie there but she was not entitled, as I understand it, to subject other vessels to any unnecessary risk, without warning in any event. Even if we assume that this cable running to the pier was necessary on the part of the dredge—it has been so testified and I think that it is so—the dredge did not give proper notice that the cable was there. It seems to me the least she could have done would be to put something on the cable itself which would be visible to vessels navigating there, some kind of a large sign on the cable which would have attracted attention to it.

It has been stated on the part of the city that it was bright in some places and dark in others, but I do not think that is entirely credible. I think it is more than likely that the cable was of uniform color throughout; it was a steel cable and probably was the color of ordinary steel but not a color that would constitute a notice to a vessel coming up or coming in that vicinity. It was a small cable, about an inch in diameter—not a great deal larger than a good-sized finger. It is true that it has been stated by witnesses from the dredge that the cable could be plainly seen fourteen hundred feet away. While I think the witnesses who have testified to that are entirely credible, they went that distance away for the special purpose of seeing how far the cable could be seen. I do not think that a vessel, keeping an ordinary lookout, should be required to see that cable fourteen hundred feet away or any such distance. In short, I think those people on the fireboat, and the lookout, saw the cable as soon as they could and I think they were exercising as much vigilance as could be expected of them as far as a cable used in that way is concerned. If the dredge had put a large sign on the cable itself which could have been seen the case would present a very different aspect to me, but I do not believe that any ordinary lookout should be expected to have seen that cable.

It has been argued here that a lookout is put on board to see unusual things, but I have not had my notice called to a case where a lookout was found to be lacking, because he did not see a rope, or a thing of that kind in

the air. There was not much to attract the attention of the eye—a slight cable of neutral color. Taking that view of the case I am unable to see how the fireboat was negligent.

I think the fault in this case lies in the use of that kind of cable without some special notice on the cable itself which would be visible to boats having occasion to navigate where the cable stretched. I think this boat was entitled to go there. I, therefore, order a decree for libelant with order of reference.

Mr. Benedict: Will your honor rule in regard to the East River statute?

The Court: In reference to the East River statute, I think I have in substance covered that. I do not see that the statute is binding on fireboats going to a fire. It is intended to apply to ordinary vessels going up and down the river, with respect to each other, not as going to a fire. Of course, if the fireboat came in collision with another vessel that was on the side of instead of near the middle of the river, it might be argued with some force, but I do not think the statute is designed to prevent fireboats from going in the most direct course to their destination. It is true it is said here by the pilot of the fireboat that it is customary to avoid an adverse tide. I think that is quite likely. But it was his duty to steer in a way that would bring him as quickly as possible to the fire, the place which he was seeking to find. That was what he was doing here and it carried him between the dredge and the pier.

Robinson, Biddle & Benedict, for appellant.

Archibald R. Watson, Corp. Counsel (Theodore Connoly and Geo. P. Nicholson, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. October 26, 1907, steam dredge No. 1 and her scow were lying in the East River about 140 feet off the pier at the foot of Flushing street, Long Island City, by permission of the War Department, engaged in removing a blanket of clay which had been deposited on the bottom of the river over the tunnel being excavated between New York and Long Island City to prevent the escape of compressed air. The dredge was moored by anchors on her offshore side, and by two one-inch wire cables extending from her upper works at the bow and extended through the air to the pier. Nothing was hung upon these cables to indicate their presence, nor any lookout kept to warn approaching vessels. The only notice, other than the cables themselves, to any vessel coming up the East River, was a large sign on the dredge reading, "Danger! Look out for Anchor Cables!" About 2:30 p. m. the city fireboat David A. Boody, hurrying to an alarm of fire at the next street above Flushing street, ran into the first cable and sustained considerable damage.

The trial judge found that the Boody, though keeping a reasonable lookout, did not discover the cable until within 100 or 150 feet of it, and that the danger notice, which was seen by those on the fireboat, instead of assisting was calculated to mislead them, by causing them to look for cables leading into the water instead of through the air. He found the dredger at fault for not giving a better warning of this dangerous and not to be looked for obstruction, and the fireboat free from fault. We fully concur in this conclusion. The only question causing doubt is whether the fireboat was at fault for violating section 757 of the consolidation act (Laws 1882, c. 410), which is still in force and reads:

"All the steamboats passing up and down the East River between the Battery * * * and Blackwell's Island shall be navigated as near as possible in the center of the river, except in going in and out of the usual berth or landing place of such steamboat," etc.

We have heretofore had occasion to pass upon this and a similar statute, and to hold that violation of such statutory obligations is not a fault, if it be only a condition and not a cause of the injury complained of. The Clara, 55 Fed. 1023, 5 C. C. A. 390; The Benjamin Franklin, 145 Fed. 13, 76 C. C. A. 43; B. & O. R. R. Co. v. La Bretagne, 179 Fed. 286. We do not connect the Boody's violation of the statute causally with the accident.

The decree is affirmed, with interest and costs.

COXE, Circuit Judge. I concur in the result. I think, however, that from the very nature of her occupation a fireboat cannot render efficient service and at all times obey the rule requiring steamboats to navigate in the center of the river. The Boody was answering an alarm and it was her duty to reach the fire by the shortest possible route.