## THE WILLIAM NELSON.

## NEWTOWN CREEK TOWING CO. v. KNICKERBOCKER ICE CO.

(District Court, E. D. New York. December 14, 1923.)

**1. Navigable waters ☜24—Wreck held not sufficiently marked.**

A submerged barge lying in a slip alongside a pier, and extending 30 to 35 feet beyond the end of the pier, *held* not marked in compliance with Act March 3, 1899, § 15 (Comp. St. § 9920), where it was not marked at all by buoy or beacon in the daytime, and at night only by lights placed even with the end of the pier.

**2. Navigable waters ☜24—Navigating near piers in East River held not fault precluding recovery for injury from striking unmarked wreck.**

That a tug was passing 20 feet off from the ends of the piers in East River, though laws N. Y. 1848, c. 321, § 1, requires vessels to navigate as near the center of the river as possible, *held* not a fault which precluded recovery for an injury caused by striking an unmarked sunken wreck which extended into the channel.

**3. Shipping ☜209(3)—Right to limitation of liability.**

To entitle the owner of a barge which filled and sank in a channel to limitation of liability for injury to a vessel which struck the wreck he has the burden of proving that she was seaworthy, or that he exercised due diligence to make her so.

**4. Shipping ☜209(3)—Evidence held not to establish the seaworthiness of a barge which filled and sank in East River.**

That a barge while being towed a short distance in East River, and without striking any obstruction, sprung a leak, and made 7 feet of water in 20 minutes, raises a presumption that she was unseaworthy, which is not rebutted where she had been lying in a slip for several months and was moved without inspection.

**5. Navigable waters ☜24—Shipping ☜207—Owner of sunken barge which failed to mark or remove wreck as required by law held liable for injury to tug striking her.**

The owner of a barge which sprung a leak while being towed a short distance in East River, and sank in a slip, leaving 30 to 35 feet beyond the end of the pier, and which was not marked as required by law nor removed until after 30 days, though a wrecking company offered to raise her within a week. *held* liable for injury to a tug which struck the outer end of the wreck, and not entitled to limitation of liability.

In Admiralty. Suit by the Newtown Creek Towing Company against the Knickerbocker Ice Company, as owner of the barge William Nelson, with petition of respondent for limitation of liability. Decree for libelant, and petition for limitation denied.

Alexander & Ash, of New York City, for libelant.

Byrnes & Stoneham, of New York City, for respondent and petitioners.

CAMPBELL, District Judge. This is a suit in admiralty brought by the libelant to recover from the respondent the damages sustained by its tug Reliance by having run upon the sunken barge William Nelson, owned by the respondent, the specific fault charged in its libel against the respondent being that respondent failed to properly mark or buoy the place where the said barge William Nelson was sunk and to remove the said barge promptly after her sinking.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The respondent by its answer alleged as a defense that the Reliance struck the said barge William Nelson, but that at the time of the accident the sunken barge was properly marked with two beacons, by two lighted red lanterns fastened on wooden arms extending from the pier alongside of said sunken barge, and that the accident was caused by the negligence of the master and lookout of the Reliance in failing to observe the lanterns, keep a proper lookout, and avoid the wreck, and that it had made all reasonable and diligent efforts to cause the removal of the said barge William Nelson by a wrecking company.

The respondent in the first entitled suit has filed a petition for limitation of liability, and on stipulation both the suit and petition were tried together.

On April 21, 1923, the barge William Nelson, owned by the respondent, was lying outside another barge at Ninty-First Street dock, New York City, where she had been laid up since November, 1922; there was no evidence of listing, and she was flush with the other barge. Under orders from Mr. Hillenbach, the marine superintendent of the respondent, the said barge William Nelson was to be towed to Rockland Lake, and under his orders Alwin Langler went on the barge on April 20th, and on April 21st, at about 11 a. m., came aboard as captain of said barge, and, on said marine superintendent's orders, the captain and the superintendent of the Ninety-First Street depot made an inventory of the barge, but did not go into the hold of said barge; the captain simply glanced in and saw no water. The captain did not try the pumps or make any other effort to determine if the hull was tight and sound.

Between 11 o'clock a. m. and 2 o'clock p. m. on the 21st day of April, 1923, the said barge William Nelson, being light, was taken in tow by the steam tug Senator Rice, whose deck hand went on board the barge. The barge was taken in tow alongside on the port side of the tug, a proper method. The tide was ebb, and the tug was going full speed.

About 20 minutes after the tug with the barge in tow had gotten under way, the captain of the barge William Nelson notified the master of the tug that the barge was sinking, and the master of the Senator Rice then took her into the Sixty-Fifth Street dock, called up his office, and they, under orders from Mr. Hillenbach, the superintendent of the marine department of the respondent, ordered him to take the barge to the Ninth Street dock, which he attempted to do, but when he arrived at Ninth street he was unable to get the barge into the dock, and, as she had no lines, he left one of the tug's hawsers and told the man on the dock to put lights on her. The barge had made seven feet of water in one-half an hour, and had not come in contact with anything.

The barge William Nelson, built in 1875, was 143 feet in length over all, 38 feet beam, depth keel to guard rail 11½ feet. She had a superstructure 100 feet long, 30 feet wide, 10 feet high, a capstan 2½ feet high, 8 feet from the stern, and a windmill 25 or 30 feet forward of the stern, which, when she was brought in alongside of the Ninth Street pier was about on a line with the front face of the pier.

For 14 days after April 21st the captain of the barge watched her, and for the first three or four days hung two lighted red lanterns each night on two of the arms of the windmill on the barge. He did not stay aboard the barge, but watched from the dock. After 3 or 4 days, all the superstructure having washed off aft, the windmill was removed, and the captain nailed two upright pieces of wood on spring piles on the dock near where the wreck lay at the outer end of the pier, and nightly placed two lighted red lanterns thereon, one higher than the other.

After the captain left the watchman on the pier continued to place the lights each night, but the wreck was not buoyed in the day, and the forward part of the wreck, which was in the slip, could not be seen even during the day until you were opposite the slip, and the part outside the slip was submerged even at low water.

There was some conflict of testimony as to whether the lights were lighted on the night of the accident, but I find that they were, but that they were not visible at the time more than a few feet away, because the accident occurred about 8:30 p. m. daylight saving time, and sunset took place at 8:13 p. m. daylight saving time. All of the lights placed on said pier were placed there under the orders of the marine superintendent of the respondent.

There was a change in the position of the wreck on different tides, as on a flood tide the stern moved up stream on an angle to the pier, and on the ebb tide the wreck fell down so that it was nearly parallel with the pier, the outer end under these conditions extending out further in the river, and the wreck was before the accident made fast alongside the pier with two lines.

On the 23d day of April the marine superintendent of the respondent communicated with a wrecking company about raising the wreck, but the price they gave was in his opinion too high, although they would have agreed to do the work within a week, and he therefore sought a figure from another company which was lower and satisfactory, and was accepted, although they informed him that they could not commence the work of raising the wreck until they could get the pontoons which were in use on another job.

On May 22, 1923, the tug Reliance, about 60 feet over all, and about 20 feet beam, with a draft of about 8½ to 9 feet, left Weehawken, stopping at Communipaw bound to Newtown Creek. The tide was a strong ebb, the wind from the north, and the tug, going full speed, was proceeding up the East River about 20 feet from the pier head on the New York Shore, when about 8:30 p. m., as she passed the Ninth Street pier, she rolled as though she had run upon something and passed on.

The engineer called to the master of the Reliance that they were sinking, and she continued at full speed until she came to the Thirteenth Street pier, when the master went ashore and called on the phone to try and get pumps, but the tug was down when he returned.

The tug was sound and tight in hull before the accident occurred.

The raising of the scow was commenced on the 24th day of May and completed on the 29th day of May, 1923, and at the time of rais-

ing a part of the propeller of the Reliance was found on the deck of the William Nelson.

All of the instructions given by the marine superintendent of the respondent as to the movement of the barge William Nelson, the placing of the lights, and the contracting for the raising of the wreck were communicated to the president of the respondent and approved by him prior to the accident.

[1] It was made the duty of the respondent to mark the wreck and speedily remove the same by 30 Stat. 1152, section 9920 of the U. S. Compiled Statutes, Annotated, 1916, which reads as follows:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs or to float what is known as sack rafts of timber and logs in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for."

And this act of Congress was but declaratory of the general maritime law (Sullivan v. P. Sanford Ross, Inc. (C. C. A.) 263 Fed. 348, certiorari denied, 253 U. S. 492, 40 Sup. Ct. 586, 64 L. Ed. 1029), and without any statute the law lays this obligation upon every owner who does not abandon a wrecked vessel (The Plymouth, 225 Fed. 483, 140 C. C. A. 1). This duty should have been performed in a manner calculated to give notice that this wreck extended 30 to 35 feet in the river beyond the face of the pier as it was submerged even at low water, except a portion which was 50 feet inside the end of the pier, and this could not be seen from the south side of the pier.

Only the day before this accident happened a tug at the head of the pier, when she cast off her lines and signaled for the engines to be put in head motion, could not move because her stern was found to be against the wreck.

No buoy or beacon marked the place of the wreck, as provided by the statute, supra, and, even if the lighted red lanterns, placed as they were on scantlings straight above the spring piles on the outer end of the pier nearest the wreck, were lighted, they would not about 17 minutes after sunset have been visible for more than a few feet, and even after dark, when the lights would have been visible for some distance, it does not seem to me that they would furnish a warning that there was a wreck extending out in the stream from 30 to 35 feet from the face of the pier. On the contrary, the existence of the lights placed as they were would be taken only as a warning that the berth was to be filled by some expected vessel, or that there was danger of some kind on the pier itself.

A red flag about two feet square nailed to one of the stanchions of a pier has been held not to be sufficient warning of a sunken barge in the slip where the flag is nailed. National Forwarding Co. v. Payne et al. (S. D. N. Y., July 13, 1923) 297 Fed. 663.

The waters of the East River between New York and Brooklyn are in constant use for navigation, and it was the duty of the respondent to so mark the submerged part of the wreck, extending out, as it did, so far beyond the pier line, in a way that would effectively warn all boats of the existing danger.

A proper lookout was maintained on the tug Reliance, and the lanterns, arranged as they were on the pier, cannot in my opinion be held to have put the Reliance on notice of the hidden danger of a submerged wreck extending out beyond the face of the pier.

I therefore am of the opinion that the respondent failed to perform its duty to properly buoy or mark the wreck as required by law.

[2] Respondent claims that the libelant's tug Reliance had no right to be navigating about 20 feet off the pier on the New York side, because such navigation was a violation of the East River statute. I cannot agree with the libelant, because, even if the statute in question be binding on this court, it does not apply in the instant case. The statute reads as follows:

"All the steamboats passing up and down the East River, between the Battery at the southern extremity of the city of New York and Blackwell's Island shall be navigated as near as possible in the center of the river except in going into or out of the usual berth or landing place of such steamboat, and shall not be propelled at a greater rate of speed than ten miles an hour." Laws of New York 1848, c. 321, § 1.

As modified to read:

"Steamboats * * * shall not be propelled at a greater rate of speed than eight miles an hour below Corlaers Hook nor more than ten miles an hour above Corlaers Hook." Laws 1882, c. 410, § 757.

That statute was designed to prevent collision of vessels going up or down the river with vessels entering or leaving slips.

The violation of this statute is not a fault if it be only a condition and not a cause of the injury complained of. The Clara, 55 Fed. 1021, 5 C. C. A. 390; The Benjamin Franklin, 145 Fed. 13, 76 C. C. A. 43; The La Bretagne, 179 Fed. 286, 102 C. C. A. 651; The No. 1, 180 Fed. 969, 104 C. C. A. 125.

In this harbor ships have the right to use all navigable water, and this right extends not only to the main channel, but to all water between high and low water where it will not interfere with buildings erected thereon by the owner. The City of Richmond (D. C.) 43 Fed. 85; The Steam Dredge No. 6 (D. C.) 222 Fed. 576, affirmed (C. C. A.) 241 Fed. 69, certiorari denied, Standard Gas Light Co. v. Packard Co., 244 U. S. 659, 37 Sup. Ct. 745, 61 L. Ed. 1375; National Forwarding Co. v. Payne et al., supra.

I therefore find that the libelants were not guilty of any negligence, but that the damages to their tug the Reliance were occasioned solely by the negligence of the respondent in failing to properly buoy or mark the wreck of the William Nelson, which was submerged and extended out into the stream beyond the face of the pier.

The Knickerbocker Ice Company seeks, as owner of the barge William Nelson, by petition to limit its liability, which is governed by section 4283, U. S. Revised Statutes (Comp. St. § 8021), which reads in part as follows:

"The liability of the owner of any vessel * * * for any loss, damage, or injury * * * done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

[3] Under this statute the burden of proving that the William Nelson was seaworthy was on the petitioner. The Benjamin Noble, 244 Fed. 95, 156 C. C. A. 523, affirmed Capitol Transp. Co. v. Cambria Steel Co., 249 U. S. 334, 39 Sup. Ct. 292, 63 L. Ed. 631. This burden the petitioner has failed to bear as there is no evidence that any inspection was made between October, 1922, and before she sank, because she was laid up from November, 1922, to April 21, 1923. The captain went on her on the 20th of April, 1921, and made no inspection. He returned on board on the 21st day of April, 1921, about 11 o'clock, and then, with the superintendent of the pier, took an inventory, but did not sound the pumps or go into the hold, but simply glanced into the hold and did nothing further to satisfy himself of her seaworthiness.

[4] The barge William Nelson sprung a leak without any apparent cause, and the presumption of unseaworthiness arose which has not been rebutted. Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co. (D. C.) 162 Fed. 912; Du Pont de Nemours & Co. v. Vance, 19 How. 162, 15 L. Ed. 584; Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012; The Transit, 250 Fed. 71, 162 C. C. A. 243.

In my opinion the unseaworthiness of the barge William Nelson was shown by affirmative proof, because the master of the tug which had her in tow said that within 20 minutes after leaving Ninety-First street, without receiving any injury, she made seven feet of water.

[5] As I have found, the movement of the barge, the improper marking, the position of the barge, the fact that it was submerged, and that no steps had been taken to comply with the act of Congress supra and "commence the immediate removal of the same and prosecute such removal diligently," were with the privity and knowledge of the petitioner, because all that was done was by the orders of the marine superintendent, approved by the president of the Knickerbocker Ice Company, the petitioner, long prior to the happening of the accident, and he also approved the refusal to employ the wrecking company which would have completed the work of raising the wreck within a week, and approved the making of the contract with the company which would only agree to perform the work as soon as possible, and after they had completed another job, and which did not commence the work until after the accident to libelant's tug Reliance more than a month after the sinking of the barge.

It is therefore my opinion that the loss, damage, or injury done, occasioned, or incurred in the sinking of the Reliance was with the privity or knowledge of such owner or owners of the barge William

Nelson, the petitioner, the Knickerbocker Ice Company, and that its petition to limit liability should be denied.

A decree may be entered in favor of the libelant, with costs, and the usual order of reference will be granted in the first suit, and a decree may also be entered denying the petition of the Knickerbocker Ice Company for limitation of liability, with costs.