## The PENOLES.

### SCOTIA CORPORATION v. DAVIS, Director General.

(Circuit Court of Appeals, Second Circuit. November 21, 1924.)

No. 89.

**Collision ⬤106 — Lighter leaving pier and passing vessels all held in fault.**

Under the rule of special circumstances, collision between three vessels *held* due to fault of all, in that steam lighter left pier without looking to see how she would block way of plainly visible vessels hugging shore against ebb tide, and without signaling before she assumed position of obvious danger, and that steam tug, with car float, failed to observe another steam lighter, which she overtook and

bottled up under the other lighter's stern, and that both tug and approaching lighter failed to timely stop and reverse, if necessary, in face of impending collision.

Learned Hand, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by the Scotia Corporation against James C. Davis, Director General, and the steam lighter Penoles; the Newark & New York Bay Navigation Company, claimant. Decree for libelant, and respondents appeal. Reversed, with directions.

Charles W. Hagen, of East Orange, N. J., and L. J. Matteson and Bigham, Englar & Jones, all of New York City, for appellant Davis.

Ralph O. Willguss and Watson, Harrington & Sheppard, all of New York City, for the Penoles.

Geo. V. A. McCloskey, William Martin, and Foley & Martin, all of New York City, for appellee.

Before HOUGH and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge. On the afternoon of a summer day, in fair weather, and the ebb tide of the East River, the steam lighter Scotia was struck or "side-swiped" on her stern by a passing car float attached to the port side of the tug Auburn, and a few seconds later was hit by the steam lighter Penoles on the starboard side near the stern. This suit is to recover the damages caused by these practically simultaneous collisions.

The masters of the three steam vessels involved promptly reported in writing to the local inspectors, and about four years later two of them testified in open court as to the same matters; the master of the Scotia failed to appear. Our findings of fact are largely influenced by the discrepancies between the statements, separated by so long an interval of time.

It is certain that Scotia was lying at the end of Pier 8, East River, head to the ebb tide, and started for Pier 38, Brooklyn; therefore she went ahead under a port helm, intending to straighten out after turning much more than 90 degrees. This maneuver would expose her, moving slowly and on no settled course, to everything coming up the river and near the pierhead line. Consequently the special circumstance rule applied to her. The John Rugge, 234 F. 861, 148 C. C. A. 459; The Newark (C. C. A.) 289 F. 801.

When the Scotia was thus leaving Pier 8, Auburn with her tow and Penoles unincumbered were no further away than off the slip between Piers 6 and 7, coming up against the tide, and so near the pier head line that before Scotia got on her course for Pier 38, Brooklyn, Auburn's tow scraped her stem, and Penoles struck just forward of the fantail. For the damage resulting the court below held both Auburn and Penoles responsible, and both have appealed.

Determination of this matter plainly rests on ascertainment of what, if any, arrangements for clearing were made by signal, and how near the pier ends all parties were at and just before collision. Penoles asserts that her speed was three knots, and Auburn was going enough faster to overtake and pass Penoles on the latter's starboard side just before collision. Consequently the time between Scotia's leaving the pier and collision off the same pier (having regard to the known width of the slips) was certainly less than two minutes.

As to distance out in the river, Auburn's report to inspectors declared that she was "going up near the center of the East River." This is untrue, and the master did not repeat the statement in court, while his mate declared that the Scotia was no more than 150 or 200 feet out in the river just before collision. We find that she was certainly no more, and probably less, than that distance out, because, as Scotia lay right across the stream as Auburn's float passed up and scraped her, there was not enough room between her stern and the pier end for Penoles to go clear. Scotia, when struck, was lying perfectly still and across the stream.

Auburn's master reported to the inspectors that he blew one whistle to Scotia, and received one in reply; he testified in court that he blew one whistle twice, and Scotia replied to his second signal, and his mate (on the car float) declared that, when Auburn blew, Scotia was but 50 feet from the float. Penoles' master reported that "signal from Scotia was received and answered"; but at trial this was changed to hearing one whistle from Scotia, which he concluded was for the Auburn, whereupon Penoles stopped her engines.

Scotia's master reported that he blew two whistles to Penoles, which answered with two, and stopped to let Auburn go by his bow, "because it was evident I could not

cross his bow in safety." At the trial his deck hand denied that Scotia blew any whistles at all. Both witnesses and reports from the steam lighters assert that Auburn was "squeezing in" or "crowding" toward the Manhattan shore, and for that reason scraped Scotia's bow with her car float, and prevented Scotia from giving room under her stern for Penoles to pass between pier ends and said stern. Auburn's master did not know what was meant by the special circumstance rule, and regarded himself as obliged to hold his course and speed, because he had Scotia on his port bow; as for Penoles, he "did not notice her no time."

If, as above pointed out, the Scotia was affected by the rule of special circumstance, so were the other vessels. Where the Scotia was and what she was trying to do was apparent to both Penoles and Auburn. All the craft were very near the Manhattan shore, and the probability of that happening which did happen was apparent as soon as Scotia started; i. e., that Scotia could not move fast enough to cross Auburn's bow, and, if she stopped, Penoles could not go under her stern. Yet the latter boat did not stop her engines until collision was inevitable, and Auburn never noticed Penoles, and therefore never knew how that lighter complicated the situation.

Both the appellants were violating the East River statute, but we need not appeal to that law as a "contributing cause" of collision (The Morristown [C. C. A.] 278 F. 714), but the reason for the violation was the bad custom of hugging the Manhattan shore to avoid the strength of the ebb (The Black Diamond [C. C. A.] 273 F. 811). If, however, we accept appellant's contention that violation of the statute was a condition and not a cause of collision, the rule of special circumstances still compels us to find that Scotia was at fault for leaving a place of safety without looking to see how she would block the way of vessels plainly visible, and for making no arrangements by signal *before* assuming a place of obvious danger, and Auburn at fault for failing to observe the plight of Penoles, which she overtook and bottled up under Scotia's stern, and both Penoles and Auburn for not timely stopping and reversing, if necessary, in the face of the situation presented by Scotia's stopping.

We regard the evidence of Auburn's "crowding in" to the Manhattan shore, as an optical illusion perhaps originating in the shape of the shore just below Pier 8; but the evidence, even when so explained, emphasizes how near all parties were to the shore, and the instant necessity of stopping when Scotia showed herself as an inevitable disturber of traffic.

Decree reversed, with one bill of costs to appellants, and cause remanded, with direction to allocate damages in equal parts among the three parties to suit. Costs below to be similarly allocated.

LEARNED HAND, District Judge (dissenting). I agree with the majority as regards the Scotia's fault; indeed, so heartily as to think that it leaves nothing more of the case. I agree in discrediting the supposed crowding in of the Auburn. I agree that, though a vessel ignores the East River statute, she is not at fault unless her position is a "cause" and not a "condition" of the collision. By that the books mean only this: That when the offending vessel has been seen in season, her position, though unlawful, is a fact with which all other vessels must reckon in their navigation. This rule is well settled in the decisions of this court under cases arising either on the East River statute or on the narrow channel rule. The Clara, 55 F. 1021, 5 C. C. A. 390; The Benjamin Franklin, 145 F. 13, 76 C. C. A. 43. La Bretagne, 179 F. 286, 102 C. C. A. 651; The No. 1, 180 F. 969, 104 C. C. A. 125; The Morristown, 278 F. 714. I do not understand that the purely maritime fault of hugging the pier ends is considered as in a different category.

I dissent only on the facts, because I cannot see that the Auburn and the Penoles should or could not have done anything else than they did in fact. The Auburn was so nearly opposite the Scotia's pier, when the latter made off, as to suppose, and rightly suppose, that the Scotia would not try to cross her bows. The Scotia had no such purpose, as her whistle and the navigation show. The Auburn did right to keep on at full speed; anything else would have made impossible any chance of success by the Scotia, which meant to go under her stern. To stop or reverse would have insured disaster. She is also held for bottling up the Penoles. That would be fair enough if, when she passed the Penoles, she had any intimation that the Scotia would try the crazy navigation which she did. That is the moment to take in judging her as respects the Penoles, and no navigator ought to be held to any such anticipation.

The Penoles is held for failing to stop and reverse in season, when she saw the Scotia's position. I acknowledge that the case is

not, so clear in her favor, but it seems to me clear enough, especially in the light of the wanton conduct of the Scotia. What that vessel tried to do on her own confession was to swing· out under a port helm and thread her way under the stern of the Auburn and across the bows of the Penoles. I cannot conceive more reckless navigation, and I should be slow to charge any other vessel in the face of it. Yet, even so, since the collision of the Penoles was near the Scotia's fantail, the Scotia nearly succeeded in crossing her bows. The reason why she did not altogether succeed was that in the very midst of her maneuver the Scotia stopped her engines under the very nose of the Penoles. This she had to do, because she could not otherwise go under the Auburn's stern. Now I must own it appears to me wholly unwarranted to charge a vessel because she did not foresee such an unexpected change of plan and stop sooner. She had the right to assume that the Scotia would go on with what she tried, or at least would not stop in her path. I attribute the whole collision to the failure of the Scotia to see the Penoles at all.

The libel should be dismissed.